# LEFKOWITZ, ATTORNEY GENERAL OF NEW YORK *v.* CUNNINGHAM ᴇᴛ ᴀʟ.

No. 76–260.   Argued February 28–March 1, 1977—Decided June 13, 1977

*Irving Galt,* Assistant Attorney General of New York, argued the cause for appellant. With him on the brief were *Louis J. Lefkowitz,* Attorney General, *pro se,* and *Mark C. Rutzick,* Assistant Attorney General.

*Michael E. Tigar* argued the cause for appellees. With him on the brief were *Edward Bennett Williams* and *Harold Ungar.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

This appeal presents the question whether a political party officer can be removed from his position by the State of New York and barred for five years from holding any other party or public office, because he has refused to waive his constitutional privilege against compelled self-incrimination.

## (1)

Under § 22 of the New York Election Law,[1] an officer of a

---

*Burt Neuborne, Melvin L. Wulf,* and *Joel M. Gora* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

[1] "If any party officer shall, after lawful notice of process, wilfully refuse or fail to appear before any court or judge, grand jury, legislative committee, officer, board or body authorized to conduct any hearing or inquiry concerning the conduct of his party office or the performance of his duties, or having appeared, shall refuse to testify or answer any relevant question, or shall refuse to sign a waiver of immunity against subsequent criminal prosecution, his term or tenure of office shall terminate,

political party may be subpoenaed by a grand jury or other authorized tribunal and required to testify concerning his conduct of the party office he occupies. If the officer refuses to answer any question, or if he declines to waive immunity from the use of his testimony against him in a later prosecution, the statute immediately terminates his party office and prohibits him from holding any other party or public office for a period of five years.

In December 1975, appellee Patrick J. Cunningham (hereafter appellee) was subpoenaed pursuant to § 22 to appear and testify before a special grand jury authorized to investigate his conduct in the political offices he then held, which consisted of four unsalaried elective positions in the Democratic Party of the State of New York.[2]  Appellee moved to quash the subpoena in the state courts, arguing in part that § 22 violated his federal constitutional right to be free of compelled self-incrimination; his motion was denied. *In re Cunningham v. Nadjari,* 51 App. Div. 2d 927, 383 N. Y. S. 2d 311, aff'd, 39 N. Y. 2d 314, 347 N. E. 2d 915 (1976).  On April 12, 1976, he appeared before the grand jury in response to the subpoena. Appellee refused to sign a waiver of immunity form which would have waived his constitutional right not to be compelled to incriminate himself.[3]  Because § 22 is self-executing, appel-

---

such office shall be vacant and he shall be disqualified from holding any party or public office for a period of five years." N. Y. Elec. Law § 22 (McKinney 1964).

New York Election Law § 2 (9) (McKinney 1964) defines a party officer as "one who holds any party position or any party office whether by election, appointment or otherwise."

[2] Appellee was chairman of the State Democratic Committee and the Bronx County Democratic Executive Committee, and a member of the Executive Committee of the New York State Democratic Committee and the Bronx County Democratic Executive Committee. We are advised that appellee has recently resigned as chairman of the state organization. He retains his other party offices.

[3] In the absence of an effective waiver, New York law would have entitled appellee to transactional immunity from prosecution on all matters

lee's refusal to waive his constitutional immunity automatically divested him of all his party offices and activated the five-year ban on holding any public or party office.

The following day, appellee commenced this action in the United States District Court for the Southern District of New York. After hearing, the District Judge entered a temporary restraining order against enforcement of § 22. A three-judge court was then convened, and that court granted appellee declaratory and permanent injunctive relief against enforcement of § 22 on the ground that it violated appellee's Fifth and Fourteenth Amendment rights. We noted probable jurisdiction, 429 U. S. 893 (1976). We affirm.

## (2)

We begin with the proposition that the Fifth Amendment privilege against compelled self-incrimination protects grand

---

about which he testified. N. Y. Crim. Proc. Law §§ 50.10, 190.40, 190.45 (McKinney 1971 and Supp. 1976–1977). As appellant concedes, however, Tr. of Oral Arg. 4–5, and as the record reflects, the State also insisted on a waiver of the more limited use immunity which we have held essential to protect Fifth Amendment rights. *Kastigar* v. *United States,* 406 U. S. 441 (1972).

The waiver form which appellee's counsel represents is presented to grand jury witnesses waives "all immunity and privileges which I would otherwise obtain under the provisions of the Constitution of the United States and of the State of New York" and further "consent[s] to the use against me of the testimony so given . . . upon any criminal trial, investigation, prosecution or proceeding." McKinney's Forms for the Criminal Procedure Law § 190.45, Form 1 (1971). See N. Y. Crim. Proc. Law § 190.45. Appellee's refusal to sign this waiver form, pressed on him immediately before taking the oath, was in these circumstances an effective assertion of his Fifth Amendment privilege.

Of course, New York's procedure in this regard is not constitutionally required. Rather than permit an assertion of the Fifth Amendment privilege to confer immunity with respect to all matters testified to before the grand jury, New York could, if it chose, require a witness to assert his constitutional privilege to the specific questions he deems potentially incriminating, withholding constitutional use immunity until the validity of the assertion is upheld.

jury witnesses from being forced to give testimony which may later be used to convict them in a criminal proceeding. See, e. g., *United States* v. *Washington, ante,* at 186–187. Moreover, since the test is whether the testimony might later subject the witness to criminal prosecution, the privilege is available to a witness in a civil proceeding, as well as to a defendant in a criminal prosecution. *Malloy* v. *Hogan,* 378 U. S. 1, 11 (1964). In either situation the witness may "refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Lefkowitz* v. *Turley,* 414 U. S. 70, 78 (1973).

Thus, when a State compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment and cannot be used against the declarant in a subsequent criminal prosecution. In *Garrity* v. *New Jersey,* 385 U. S. 493 (1967), for example, police officers under investigation were told that if they declined to answer potentially incriminating questions they would be removed from office, but that any answers they did give could be used against them in a criminal prosecution. We held that statements given under such circumstances were made involuntarily and could not be used to convict the officers of crime.

Similarly, our cases have established that a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself. In *Gardner* v. *Broderick,* 392 U. S. 273 (1968), a police officer appearing before a grand jury investigating official corruption was subject to discharge if he did not waive his Fifth Amendment privilege and answer, without immunity, all questions asked of him. When he refused, and his employment was terminated, this Court held that the officer could not be discharged solely for his refusal to forfeit the rights guaranteed him by the Fifth Amendment; the privilege against compelled self-incrimina-

tion could not abide any "attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment." *Id.,* at 279. Accord, *Sanitation Men* v. *Sanitation Comm'r,* 392 U. S. 280 (1968). At the same time, the Court provided for effectuation of the important public interest in securing from public employees an accounting of their public trust. Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity. *Gardner, supra,* at 278–279.

We affirmed the teaching of *Gardner* more recently in *Lefkowitz* v. *Turley, supra,* where two architects who did occasional work for the State of New York refused to waive their Fifth Amendment privilege before a grand jury investigating corruption in public contracting practices. State law provided that if a contractor refused to surrender his constitutional privilege before a grand jury, his existing state contracts would be canceled, and he would be barred from future contracts with the State for five years. The Court saw no constitutional distinction between discharging a public employee and depriving an independent contractor of the opportunity to secure public contracts; in both cases the State had sought to compel testimony by imposing a sanction as the price of invoking the Fifth Amendment right.

These cases settle that government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized. It is true, as appellant points out, that our earlier cases were concerned with penalties having a substantial economic impact. But the touchstone of the Fifth Amendment is compulsion, and direct economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids.

## (3)

Section 22 confronted appellee with grave consequences solely because he refused to waive immunity from prosecution and give self-incriminating testimony. Section 22 is therefore constitutionally indistinguishable from the coercive provisions we struck down in *Gardner, Sanitation Men,* and *Turley.* Appellee's party offices carry substantial prestige and political influence, giving him a powerful voice in recommending or selecting candidates for office and in other political decisions. The threatened loss of such widely sought positions, with their power and perquisites, is inherently coercive. Additionally, compelled forfeiture of these posts diminishes appellee's general reputation in his community.

There are also economic consequences; appellee's professional standing as a practicing lawyer would suffer by his removal from his political offices under these circumstances. Further, § 22 bars appellee from holding any other party or public office for five years. Many such offices carry substantial compensation. Appellant argues that appellee has no enforceable property interest in future office, but neither did the architects in *Turley* have an enforceable claim to future government contracts. Nevertheless, we found that disqualification from eligibility for such contracts was a substantial economic burden. In assessing the coercion which § 22 exerts, we must take into account potential economic benefits realistically likely of attainment. Prudent persons weigh heavily such legally unenforceable prospects in making decisions; to that extent, removal of those prospects constitutes economic coercion.[4]

Section 22 is coercive for yet another reason: It requires appellee to forfeit one constitutionally protected right as the

---

[4] That appellee's refusal to waive immunity and answer questions concerning his conduct of office may have already damaged his reputation and standing is irrelevant to the issues in this case; it is inescapable that public judgments are often made on such factors.

price for exercising another. See *Simmons* v. *United States,* 390 U. S. 377, 394 (1968). As an officer in a private political party, appellee is in a far different position from a government policymaking official holding office at the pleasure of the President or Governor. By depriving appellee of his offices, § 22 impinges on his right to participate in private, voluntary political associations. That right is an important aspect of First Amendment freedom which this Court has consistently found entitled to constitutional protection. *Kusper* v. *Pontikes,* 414 U. S. 51 (1973); *Williams* v. *Rhodes,* 393 U. S. 23 (1968).

Appellant argues that even if § 22 is violative of Fifth Amendment rights, the State's overriding interest in preserving public confidence in the integrity of its political process justifies the constitutional infringement. We have already rejected the notion that citizens may be forced to incriminate themselves because it serves a governmental need. *E. g., Lefkowitz* v. *Turley,* 414 U. S., at 78–79. Government has compelling interests in maintaining an honest police force and civil service, but this Court did not permit those interests to justify infringement of Fifth Amendment rights in *Garrity, Gardner,* and *Sanitation Men,* where alternative methods of promoting state aims were no more apparent than here.[5]

(4)

It may be, as appellant contends, that "[a] State

---

[5] *Baxter* v. *Palmigiano,* 425 U. S. 308 (1976), is not to the contrary. That case involved an administrative disciplinary proceeding in which the respondent was advised that he was not required to testify, but that if he chose to remain silent his silence could be considered against him. *Baxter* did no more than permit an inference to be drawn in a civil case from a party's refusal to testify. Respondent's silence in *Baxter* was only one of a number of factors to be considered by the finder of fact in assessing a penalty, and was given no more probative value than the facts of the case warranted; here, refusal to waive the Fifth Amendment privilege leads automatically and without more to imposition of sanctions.

forced to choose between an accounting from or a prosecution of a party officer is in an intolerable position." Brief for Appellant 12–13. But this dilemma is created by New York's transactional immunity law, which immunizes grand jury witnesses from prosecution for any transaction about which they testify. The more limited use immunity required by the Fifth Amendment would permit the State to prosecute appellee for any crime of which he may be guilty in connection with his party office, provided only that his own compelled testimony is not used to convict him. Once proper use immunity is granted, the State may use its contempt powers to compel testimony concerning the conduct of public office, without forfeiting the opportunity to prosecute the witness on the basis of evidence derived from other sources.

Accordingly, the judgment is

*Affirmed.*

Mr. Justice Rehnquist took no part in the consideration or decision of this case.

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, concurring in part.

I join the Court's judgment, for the reasons stated in Parts (1), (2), and (3) of its opinion. I cannot, however, join Part (4), because I continue to believe that "the Fifth Amendment privilege against self-incrimination requires that any jurisdiction that compels a man to incriminate himself grant him absolute immunity under its laws from prosecution for any transaction revealed in that testimony." *Piccirillo* v. *New York,* 400 U. S. 548, 562 (1971) (Brennan, J., dissenting). See also *Kastigar* v. *United States,* 406 U. S. 441, 462 (1972) (Douglas, J., dissenting); *id.,* at 467 (Marshall, J., dissenting). Moreover, even on the Court's assumption that a lesser immunity is sufficient to satisfy the requirements of the Fifth Amendment, I question the propriety of the Court's suggestion that the New York Legislature's decision to grant

additional protection to the Fifth Amendment rights of grand jury witnesses was somehow contrary to the State's best interests.

MR. JUSTICE STEVENS, dissenting.

The First Amendment protects the individual's right to speak and to believe in accordance with the dictates of his own conscience. But if he believes in peace at any price and speaks out against a strong military, the President may decide not to nominate him for the office of Secretary of Defense. If he already occupies a comparable policymaking office, the President may remove him as a result of his exercise of First Amendment rights. The fact that the Constitution protects the exercise of the right does not mean that it also protects the speaker's "right" to hold high public office.[1]

The Fifth Amendment protects the individual's right to remain silent. The central purpose of the privilege against compulsory self-incrimination is to avoid unfair criminal trials. It is an expression of our conviction that the defendant in a criminal case must be presumed innocent, and that the State has the burden of proving guilt without resorting to an inquisition of the accused.[2]

---

[1] It is often incorrectly assumed that whenever an individual right is sufficiently important to receive constitutional protection, that protection implicitly guarantees that the exercise of the right shall be cost free. Nothing could be further from the truth. The right to representation by counsel of one's choice, for example, may require the defendant in a criminal case to pay a staggering price to employ the lawyer he selects. Insistence on a jury trial may increase the cost of defense. The right to send one's children to a private school, *Meyer* v. *Nebraska*, 262 U. S. 390, may be exercised only by one prepared to pay the associated tuition cost.

[2] E. Griswold, The Fifth Amendment Today 1–8 (1955); L. Levy, Origins of the Fifth Amendment: The Right Against Self-Incrimination (1968); Pittman, The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America, 21 Va. L. Rev. 763 (1935). The

Just as constitutionally protected speech may disclose a valid reason for terminating the speaker's employment, so may constitutionally protected silence provide a valid reason for refusing or terminating employment in certain sensitive public positions. Thus a person nominated to an office which may not be filled without the consent of the Senate could exercise his right not to incriminate himself during questioning by a Senate committee, but no one would doubt the Senate's constitutional power to withhold its consent for that very reason. Nor can there be any doubt concerning the President's power to discharge any White House aide who might assert his Fifth Amendment privilege in response to a charge that he had used his office to conceal wrongdoing or to solicit illegal campaign contributions.

I see no reason why there should be any greater doubt concerning a state governor's power to discharge an appointed member of his personal staff who asserts his Fifth Amendment privilege before a grand jury investigating accusations of influence peddling in state government.[3] And since a constitutional limitation on the power of the "government," see *ante,* at 806, applies equally to the legislature and the executive, a statutory restriction is no more objectionable than an executive order.

My comments thus far have related to policymaking officials who seek or occupy positions which have no exact counterpart in the private sector of the economy. In our democracy, their power to govern is ultimately derived from, and dependent upon, the sanction of the citizenry they serve.

---

privilege has engendered a great deal of legal scholarship over the years. See Dean Griswold's thoughtful review of the literature and of his own writings in The Right to be Let Alone, 55 Nw. U. L. Rev. 216 (1960). See also Friendly, The Fifth Amendment Tomorrow: The Case for Constitutional Change, 37 U. Cin. L. Rev. 671, 706–708 (1968).

[3] See, *e. g., Scott* v. *Philadelphia Parking Auth.,* 402 Pa. 151, 154, 166 A. 2d 278, 280–281 (1960); *Mitchell* v. *Chester Housing Auth.,* 389 Pa. 314, 328, 132 A. 2d 873, 880 (1957).

Their performance in office not only must satisfy high standards of competence and efficiency but must also inspire confidence in the integrity of their leadership.[4] For that reason, conditions may appropriately be attached to the holding of high public office that would be entirely inappropriate for the vast majority of government employees whose work is not significantly different from that performed in the private sector.[5]

The Court has decided in the past that workers such as sanitation men employed by a state-chartered municipality may not be threatened with the loss of their livelihood in order to compel them to waive their privilege against self-incrimination.[6] Neither that decision, nor any in its line,[7] controls this case. For rules which protect the rights of government workers whose jobs are not fundamentally different from positions in other areas of society are not automatically applicable to policymaking officials of government.[8]

---

[4] Note, A Constitutional Analysis of the Spoils System, 57 Iowa L. Rev. 1320, 1321 n. 12 (1972); Note, 17 Vill. L. Rev. 750, 753–754 (1972); Note, 26 Vand. L. Rev. 1090, 1092 n. 12 (1973).

A line of cases in the Seventh Circuit has addressed the distinction between policymaking and nonpolicymaking state employees, *Indiana State Employees Assn., Inc.* v. *Negley,* 501 F. 2d 1239 (1974); *Adams* v. *Walker,* 492 F. 2d 1003, 1007 (1974); *Illinois State Employees Union, Council 34* v. *Lewis,* 473 F. 2d 561, 574 (1972), cert. denied, 410 U. S. 928; *Gould* v. *Walker,* 356 F. Supp. 421 (ND Ill. 1973). See *Pickering* v. *Board of Education,* 391 U. S. 563, 570, and n. 3.

[5] See *Orloff* v. *Willoughby,* 345 U. S. 83, 90–92; *Napolitano* v. *Ward,* 457 F. 2d 279 (CA7 1972).

[6] *Sanitation Men* v. *Sanitation Comm'r,* 392 U. S. 280.

[7] *Lefkowitz* v. *Turley,* 414 U. S. 70; *Gardner* v. *Broderick,* 392 U. S. 273; *Garrity* v. *New Jersey,* 385 U. S. 493.

[8] Cf. *Elrod* v. *Burns,* 427 U. S. 347, 367–368 (plurality opinion); *Sugarman* v. *Dougall,* 413 U. S. 634, 642–643; *United Public Workers* v. *Mitchell,* 330 U. S. 75, 115, 122–123 (Douglas, J., dissenting in part); *Myers* v. *United States,* 272 U. S. 52, 240–241 (Brandeis, J. dissenting); *Indiana State Employees Assn., Inc.* v. *Negley, supra; Mow Sun Wong* v.

Appellee Cunningham (hereinafter appellee) is a policymaking official occupying a sensitive position in the government of the State of New York. He is chairman of the State Democratic Committee and of the Bronx County Democratic Executive Committee. By virtue of holding those party positions he performs several important statutory offices for the State of New York.[9] If "heed is to be given to the realities of political life, [he is one of] the instruments by which government becomes a living thing." *Nixon* v. *Condon,* 286 U. S. 73, 84. The leaders of a major political party "are not acting in matters of merely private concern like the directors or agents of business corporations. They are acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions unbrokenly and smoothly." *Id.,* at 88.

The State has a legitimate interest, not only in preventing actual corruption, but also in avoiding the appearance of corruption[10] among those it favors with sensitive, policymaking office. If such a person wishes to exercise his constitutional right to remain silent and refuses to waive his privilege against compulsory self-incrimination, I see no rea-

---

*Hampton,* 500 F. 2d 1031, 1040 (CA9 1974), aff'd, 426 U. S. 88, 95–96; *Leonard* v. *Douglas,* 116 U. S. App. D. C. 136, 321 F. 2d 749 (1963).

[9] Appellee selects nominees for commissioner of the State Board of Elections which administers New York elections, N. Y. Elec. Law § 468 (McKinney Supp. 1976–1977). He has similar powers with respect to local election officers, §§ 31, 40, 45 (McKinney 1964). The committees he chairs have the power to designate candidates for office in party primary elections, § 131 (2), to fill vacancies which occur in the party slate in Bronx County, §§ 131, 140, and to nominate Democratic electors for the offices of President and Vice President of the United States, § 131 (1).

[10] See *Buckley* v. *Valeo,* 424 U. S. 1, 25–27. To the extent that it legitimizes the Government's concern with the integrity of the election process, *Buckley* is particularly apposite here. The majority of the appellee's statutory powers concern the administration and enforcement of New York's election laws.

son why the State should not have the power to remove him from office.[11]

I recognize that procedures are available by which the State may compel *any* of its employees to render an accounting of his or her office in exchange for a grant of immunity.[12]

---

[11] Of course, it may not do so because it wishes to punish him for the exercise of his right, or as a substitute punishment for the crimes of which he might be suspected. But the State does have a legitimate interest in the integrity, and in the appearance of integrity, of those serving in its governing core. Cf. *In re Daley*, 549 F. 2d 469, 474–477 (CA7 1977).

Appellee's removal from a statutorily recognized state political office does not deprive him of his right to associate for political reasons, see *ante*, at 807–808. The impact on this right is surely no more significant than the impact of the statute on his privilege against compulsory self-incrimination. For § 22 leaves appellee free to participate in Democratic Party political activities in all the capacities recognized as protected by our right-to-associate cases.

Nor does this case present the question whether the imposition of the five-year ban on holding state office contained in § 22 may be invalid as a penalty.

[12] The failure to tender immunity was the critical missing element which invalidated the discharges of the policeman in *Gardner* v. *Broderick*, 392 U. S. 273, and the sanitation men in *Sanitation Men* v. *Sanitation Comm'r*, 392 U. S. 280, 284–285:

"If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, *Garrity* v. *New Jersey, supra*, the privilege against self-incrimination would not have been a bar to his dismissal." *Gardner* v. *Broderick, supra*, at 278.

I recognize that *Gardner* v. *Broderick* and *Garrity* v. *New Jersey*, 385 U. S. 493, make it clear that law enforcement officers are indistinguishable from other government employees as far as the privilege against compulsory self-incrimination is concerned. In view of the large measure of state power and public trust we grant our police, I am not sure that I would have joined those decisions. But extension of the largest measure of the Fifth Amendment privilege to the police does not require its further extension to this case. See *supra*, at 812 (text to n. 7).

But the availability of that alternative does not require us to conclude that our highest public officers may refuse to respond to legitimate inquiries and remain in office unless they are first granted immunity from criminal prosecution. The Fifth Amendment does not require the State to pay such a price to effect the removal of an officer whose claim of privilege can only erode the public's confidence in its government.

The New York statute, if enforced, will require the state chairman to make a choice between silence and public service. Appellee was on notice on this possibility when he accepted his offices.[13] He has an unquestioned constitutional right to choose either alternative. The choice may indeed be a difficult one for him to make. In constitutional terms, however, I see no difference between his choice and that confronted by many other public-spirited citizens who are at once asked to serve their country and to respond publicly to any suggestion of wrongdoing that may be advanced by any hostile or curious witness. The fact that such a choice may be difficult is not a reason for saying that the State has no power to require an officeholder or officeseeker to make it.

I respectfully dissent.

---

[13] Section 22 was enacted in 1949, years before appellee gained his chairmanships.