James **MOFFETT** et al.

v.

**CITY OF PORTLAND** et al.

Supreme Judicial Court of Maine.

April 10, 1979.

Richardson, Hildreth, Tyler & Troubh by Ronald D. Russell, Portland (orally), Glen L. Porter, Bangor (orally), amicus curiae, Maine Chiefs of Police Ass'n.

William J. O'Brien, Jr. (orally), Deborah Keef, Portland, for City of Portland.

Preti, Flaherty & Beliveau by John J. Flaherty, David M. Cohen, Portland, for amicus curiae, Guy Gannett Publishing Co.

Before McKUSICK, C. J., and POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

Plaintiffs Portland police officers [1] appeal from the Superior Court's dismissal of their motion for a preliminary injunction to prevent defendants, the City of Portland, the City Manager, and the Portland Chief of Police,[2] from publicly disclosing transcripts of statements made by the officers during an internal police disciplinary investigation. Guy Gannett Publishing Company (hereafter "Gannett"),[3] the publisher of daily newspapers in Portland, which seeks access to those records, bases its request upon section 408 of the Maine Freedom of Access Act,[4] 1 M.R.S.A. § 401 et seq. (1978), which reads in pertinent part:

---

1. Police officers James Moffett, Donald Mowatt, Francis Batchelder, John Fanning, Chris Murphy, David Richardson, Allan McIntire, and Robert Ridge are the plaintiffs in this case.

2. We hereafter refer to all defendants collectively as "the City."

3. The complaint also named Guy Gannett Publishing Company as a defendant. At the hearing in Superior Court on December 13, 1978, the trial justice granted a motion to dismiss the complaint as to defendant Gannett. Gannett then moved for permission to participate in the hearing as amicus curiae. This motion was denied. Subsequently, after appellants filed notice of appeal to the Law Court, all parties executed a consent form agreeing that Gannett could submit an amicus brief to the Law Court. Rule 75A(f)(1), M.R.Civ.P.

4. The legislative history of the Freedom of Access Act shows that access to public records and proceedings has had the continuing attention of the state legislature for the past two decades. As originally enacted by P.L.1959, ch. 219, the so-called Right to Know Law provided for a right of public access to "public proceedings" and granted the public the right to inspect all records or minutes of such meetings. The act remained essentially unchanged until 1973 when the legislature expanded its scope by requiring that every governmental agency make a written record of every "decision" regarding licenses and permits, and by granting the public a right to inspect these records. P.L.1973, ch. 433, § 2. The act was again amended to provide that legislative records were to be open to public inspection. P.L.1975, ch. 483, § 1.

Additionally, a new definition of "public records" was promulgated, id. § 3; however, that latter definition of "public records" was immediately repealed and replaced by P.L.1975, ch. 623, § 1, effective October 2, 1975.

"Except as otherwise provided by statute, every person shall have the right to inspect and copy any public record during the regular business hours of the custodian . . . ."

Section 402(3) of the Act, however, defines "public records" to exclude:

"B. Records that would be within the scope of a privilege against discovery or use as evidence recognized by the courts of this State in civil or criminal trials if the records or inspection thereof were sought in the course of a court proceeding; . . . ." (hereafter referred to as "Exception B")

Plaintiff officers [5] contend that the requested investigatory records fall within Exception B to the Freedom of Access Act because use of those records as evidence in a criminal trial against them would be barred by their Fifth Amendment privilege against self-incrimination; and the officers also point out that the City's contract with their union requires that "the interrogation of police officers shall be conducted with the maximum amount of confidentiality possible." From those premises the police officers urge that the City has no duty under the Freedom of Access Act to disclose the investigatory records and, in the absence of any such duty, is contractually obligated not to do so. Unless enjoined, the City has declared its intention of complying with Gannett's request by turning over copies of the officers' statements and has in this proceeding actively defended its right to do so.

The applicable law supports the position taken by the police officers, and accordingly we sustain their appeal.

## I. The Facts

On September 9, 1978, plaintiff police officers were called to investigate a disturbance on Winter Street in Portland. Several persons were arrested. Later, civilian complaints were filed against the officers charging that they had used excessive force in making the arrests.

The Portland Police Department conducted an internal investigation of the incident to determine whether any of the officers should be disciplined. Lieutenant Guevin and Sergeant Stanhope interviewed each of the eight plaintiff police officers and made a verbatim transcript of the proceedings. Although no express mention was made of the possibility of dismissal from the police force, each officer was informed before the interview began that failure to answer the questions put to him could result in "disciplinary action." [6] Relying on the City's promise of maximum possible confidentiality contained in its contract with the Police Benevolent Association, and faced with the threat of "disciplinary action" if he remained silent, each officer answered all

The first special session of 1976 repealed the entire Freedom of Access Act as variously amended previously and rewrote it, codifying many of the provisions that had been developed in the prior amendment process. P.L. 1976, ch. 758, effective July 29, 1976.

The statutory language exempting records "within the scope of a privilege," herein called Exception B, first appeared in P.L.1975, ch. 623, § 1, effective October 2, 1975, and was taken over without change in the 1976 rewriting and codification of the Freedom of Access Act by P.L.1976, ch. 758. Thus, Exception B, which we are now called upon to construe for the first time, has been in the law for only about three years.

5. The Maine Chiefs of Police Association as an amicus curiae has filed a brief and argued orally in support of the position taken by plaintiffs.

6. In summarizing plaintiffs' arguments, the opinion below refers to Portland Police Department Regulations § 5.15, ¶ 13, requiring police officers " 'to answer questions by or render material in relevant statements to competent authority in a departmental investigation when so directed' or be subject to possible disciplinary action including dismissal." The interrogation procedure used by the police department did not offend constitutional principles in any way. "Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity [against self-incrimination]." *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977). *See also Sanitation Men v. Sanitation Commissioner*, 392 U.S. 280, 284, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Gardner v. Broderick*, 392 U.S. 273, 278, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).

questions. Counsel for the City conceded in the hearing before the Superior Court that the officers "were compelled to make the statements against their free will." After completing all the interviews, Lieutenant Guevin and Sergeant Stanhope submitted a final report in which they concluded that all of the civilian complaints of police misconduct were without merit.

Authorized police summaries of the eight interviews with plaintiff police officers were released to the press. Gannett then formally requested the City to give it access to the complete transcripts of the interviews. On advice of counsel, the City Manager advised Gannett by a letter dated December 11, 1978, that the requested records would be made available under the Freedom of Access Act, but that the police officers involved would first be given an opportunity to take legal action to challenge the public disclosure of their interview transcripts.

 The eight police officers promptly filed a complaint in the Superior Court (Cumberland County) seeking both a preliminary and a permanent injunction against public disclosure of their statements. After a hearing on December 13, 1978, the Superior Court by order dated December 22, 1978, denied the police officers' motion for a preliminary injunction. The police officers then prosecuted this appeal.[7] Recognizing that the public interest demanded a speedy resolution of this controversy, the court granted the parties' request for an expedited hearing of this appeal on March 19, 1979.[8]

## II. *The Police Officers' Constitutional Privilege Against Self-Incrimination*

Before turning to the question of statutory construction whether the word "privilege" is used in Exception B of the Freedom of Access Act to encompass the privilege against self-incrimination, we must decide whether these plaintiff police officers under the circumstances of their disciplinary interrogation can in any event assert that their Fifth Amendment privilege bars use of the transcripts against them in a subsequent criminal action.

The police officers rest their contention that the transcripts are protected by their privilege against self-incrimination upon *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). In *Garrity,* investigators had warned police officers suspected of participation in a conspiracy to fix traffic tickets that they would be subject to removal from office if they refused to answer the questions put to them. The officers then had given incriminating statements, which were introduced in evidence in subsequent trials where the officers were convicted of criminal offenses. In reversing their convictions, the United States Supreme Court concluded that the threat of discharge deprived the officers of their " 'free choice to admit, to deny or to refuse to answer.' " *Id.* at 496, 87 S.Ct. at 618. The Court said:

> "The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty

7. Pursuant to Rule 62(d), M.R.Civ.P., a stay pending appeal was granted, in order to prevent disclosure of the requested records, which would have rendered the issues in this case moot.

8. Ordinarily there must be a final judgment before an appeal can be taken to the Law Court, but an exception is permitted where substantial rights of a party will be irreparably lost if review is delayed until final judgment. See *Hazzard v. Westview Golf Club, Inc.,* Me., 217 A.2d 217, 222 (1966). The federal courts have followed the same rule. *Cf. Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 441, 76 S.Ct. 895, 903, 100 L.Ed. 1297 (1956) (Frank-

furter, J., concurring) ("the Court has permitted appeal before completion of the whole litigation when failure to do so would preclude any effective review or would result in irreparable injury"); *United States v. Wood,* 295 F.2d 772, 777 (5th Cir. 1961). Here, failure to allow the police officers to appeal the denial of their motion for a preliminary injunction *would* mean that the interview transcripts would be publicly disclosed, and the issue of whether any part of the transcripts are exempt from the *Freedom of Access Act would* become moot. On these facts, an appeal is appropriate as an exception to the "final judgment" rule.

of self-incrimination is the antithesis of free choice to speak out or to remain silent. . . . We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions." *Id.* at 497–98, 87 S.Ct. at 618–619.

In the case at bar, the Superior Court justice, in denying plaintiff police officers' motion to enjoin public disclosure of the transcripts, distinguished *Garrity* on the basis of the warning given the officers prior to the interrogation. The trial justice noted that in *Garrity* the officers being interrogated were faced with "a specific state statute mandating a forfeiture of 'office, position or employment' of any person holding an elective or appointive public office who refused to answer questions while under oath," while the officers in the instant case were merely threatened with unspecified "disciplinary action."

■ The Superior Court justice's reading of *Garrity* as applied to this case is unnecessarily narrow. All involuntary self-incriminating statements, regardless of the nature of the coercion that produced them, are privileged under the Fifth Amendment. "[T]he touchstone of the Fifth Amendment is compulsion," *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 2137, 53 L.Ed.2d 1 (1977), and the compulsion may take many forms. "[D]irect economic sanctions and imprisonment are not the only penalties capable of forcing the self-incrimination which the Amendment forbids." *Id.* at 806, 97 S.Ct. at 2137. The loss of unsalaried political positions involved in *Cunningham* had no direct economic consequences upon the politician-lawyer. Recognizing that its earlier decisions had been premised on "penalties having a substantial economic impact," the Supreme Court nevertheless held that the indirect consequences of the political dismissals were sufficient to trigger the protection of the Fifth Amendment. The Court noted that the loss of his political offices deprived the politician of substantial prestige and political influence, diminished his general reputation

in the community, and indirectly had an economic impact on his professional practice of law by injuring his reputation. In assessing coercion the Court took into account those "potential economic benefits" of which Cunningham "might" be deprived. Thus, the test is whether the threatened penalty "reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his 'free choice to admit, to deny, or to refuse to answer'." *United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974), citing *Garrity v. New Jersey, supra*, 485 U.S. at 495, 87 S.Ct. 616.

■ Even if the City had not conceded that plaintiff police officers "were compelled to make the statements against their free will," this record establishes beyond debate that they were in fact deprived of their "free choice to admit, to deny or to refuse to answer." Although the officers apparently were not told what sanctions exactly would be employed if one of them resisted responding to the departmental interrogation, the officers could have reasonably assumed that the threatened "disciplinary action" ran the gamut from demerits or reprimands to dismissal. But no matter what particular sanctions may have been contemplated, one thing is clear: *any* disciplinary action would become a part of the officer's history of career service. Even the accumulation of a few demerits might impair his career progress and could lead to his later nonpromotion, suspension, or even dismissal. Much like the clouding of the lawyer-politician's reputation in *Lefkowitz v. Cunningham, supra*, the imposition of any disciplinary sanction would cast a shadow over the professional reputation of the officer and would have similar indirect economic effects. The threat of potential disciplinary sanctions raised the specter of significant future economic injury which might have to be borne as the price of the police officers' assertion of his constitutional privilege to remain silent. The indisputable fact in this case is that the statement made by each of plaintiff police officers was coerced.

In view of the involuntary nature of his statement, each officer now has a privilege under the Fifth Amendment to bar the use of that statement in any way in a criminal prosecution against him. The coercion exerted by the threat of disciplinary action constituted "a classic case of 'compelling' a defendant to be a witness against himself." *New Jersey v. Portash,* —— U.S. ——, 99 S.Ct. 1292, 1299, 59 L.Ed.2d 501 (1979) (Powell, J., concurring). *Portash* has recently outlined the consequences of the use of coercion to obtain a statement such as those obtained from plaintiff police officers. The Fifth Amendment forbids *any* use of such a coerced statement in a criminal proceeding against the person forced to make the statement. It excludes use of an involuntary statement even for impeachment purposes. *New Jersey v. Portash, supra.* In *Portash* the defendant was coerced into testifying before a grand jury by the threat of contempt sanctions. Here, the coercion consisted of a threat of disciplinary action. Exactly as the Fifth Amendment forbade the use, for any purpose, of the defendant's grand jury testimony in *Portash,* so each officer's involuntary statement is subject to his privilege to bar its use in any criminal proceeding against him.

█ The fact that each interrogation transcript is privileged does not mean that the interrogated officer cannot be prosecuted and convicted of a crime, if any crime was committed by him. "The privilege has never been construed to mean that one who invokes it cannot be subsequently prosecuted. Its sole concern is to afford protection against being 'forced to give testimony leading to the infliction of penalties affixed to . . . criminal acts'." *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). In the case at bar the privileged nature of the coerced statement made by each officer merely means that he may not be convicted by use in any way of the words that were forced out of his own mouth.[9]

In sum, the entire statement made under coercion by each police officer would in any criminal proceeding be within the scope of his Fifth Amendment privilege against self-incrimination as interpreted last month by *Portash.*

### III. *Meaning of Exception B to the Freedom of Access Act*

We are then brought to the question which lies at the heart of this case: Did the legislature intend to include the Fifth Amendment privilege among those "privilege[s] against . . . use as evidence recognized by the courts of this State in . . . criminal trials"? Has the legislature made an exception to the Freedom of Access Act for those records of subject matter that would be subject to the Fifth Amendment privilege against self-incrimination if sought to be used as evidence in a criminal trial? We are compelled to answer in the affirmative.

█ In construing a statutory provision a court must look first and primarily at the language of the provision. Here the wording of the disputed Exception B, 1 M.R.S.A. § 402(3)(B), could hardly be more clear.[10]

---

9. We do not mean to imply that plaintiff police officers committed any crimes. Here we decide merely that in the hypothetical event that a criminal prosecution were pressed against one of these officers, then the Fifth Amendment privilege would bar any use whatever of his coerced statement.

10. The complete text of 1 M.R.S.A. § 402(3), defining what are and what are not "public records" that must be disclosed under section 408, reads as follows:

"3. Public records. The term 'public records' shall mean any written, printed or graphic matter or any mechanical or electronic data compilation from which information can be obtained, directly or after translation into a form susceptible of visual or aural comprehension, that is in the possession or custody of an agency or public official of this State or any of its political subdivisions and has been received or prepared for use in connection with the transaction of public or governmental business or contains information relating to the transaction of public or governmental business, except:

"A. Records that have been designated confidential by statute;

"B. *Records that would be within the scope of a privilege against discovery or use as evidence recognized by the courts of this State in civil or criminal trials if the records*

What would otherwise be "public records" are not "public records" if they

> "would be within the scope of a privilege against discovery or use as evidence recognized by the courts of this State in civil or criminal trials if the records or inspection thereof were sought in the course of a court proceeding."

The term "privilege against discovery or use as evidence" is at once precise and comprehensive. With care, the legislative draftsmen spelled out the way of determining whether particular records fall within the privileged records exception; that determination is to be made by considering whether by reason of a privilege they would be inadmissible as evidence in a court proceeding in the State of Maine. In addition to the privilege against self-incrimination declared by the Fifth Amendment to the United States Constitution, various privileges codified in Article V of the Maine Rules of Evidence and others provided by statute are "recognized by the courts of this State." [11] For example, Rule 504, M.R. Evid., makes husband-wife communications excludable from use as evidence under specified circumstances, and 35 M.R.S.A. § 141

(1978) similarly makes inadmissible in evidence accident reports filed by utilities with the Public Utilities Commission. *See also* 17 M.R.S.A. § 3964 (Supp.1978) (statements obtained in hospital within 30 days of injury); 26 M.R.S.A. § 2 (Supp.1978) (accident reports filed with the Director of the Bureau of Labor). Each of the privileges is justified by its own policy considerations recognized by the law, and each has developed its own special limitations and rules. The legislature declared that the public disclosure exception applied to a record falling within the scope of *any* evidentiary privilege recognized in the courts of Maine, and at the same time in effect incorporated by reference the special rules that have been developed by constitutions, statutes, rules of court, and judicial decisions to define the scope of the particular privilege.

To lawyers and nonlawyers alike, the word "privilege" selected by the legislature has a plain and all-encompassing meaning. The word carries not the slightest suggestion that only certain privileges are meant to be referred to by Exception B. Least of all does the language itself in any way suggest that the term "privilege against

---

or inspection thereof were sought in the course of a court proceeding*;
"C. Records, working papers and interoffice and intraoffice memoranda used or maintained by any Legislator, legislative agency or legislative employee to prepare proposed Senate or House papers or reports for consideration by the Legislature or any of its committees during the biennium in which the proposal or report is prepared;
"D. Material prepared for and used specifically and exclusively in preparation for negotiations, including the development of bargaining proposals to be made and the analysis of proposals received, by a public employer in collective bargaining with its employees and their designated representatives; and
"E. Records, working papers, interoffice and intraoffice memoranda used by or prepared for faculty and administrative committees of the Maine Maritime Academy and the University of Maine. The provisions of this paragraph do not apply to the boards of trustees, and the administrative council of the University of Maine, which are referred to in section 402, subsection 2, paragraph B." (Emphasis added)

11. On February 1, 1976, almost contemporaneously with the legislature's rewriting and codi-

fication of the Freedom of Access Act into its present form by P.L.1976, ch. 758, to be effective July 29, 1976, the Supreme Judicial Court promulgated the Maine Rules of Evidence. Evidence Rule 501 broadly declares the sources of the evidentiary privileges "recognized by the courts of this State in civil or criminal trials":

> "Except as otherwise *provided by Constitution or statute or by these or other rules* promulgated by the Supreme Judicial Court of this state no person has a[n evidentiary] privilege . . . ." (Emphasis added)

In enacting Exception B, the legislature, by contemporaneously referring to evidentiary "privilege[s] . . . recognized by the courts of this State," may reasonably be taken to have referred to the same privileges recognized by the Supreme Judicial Court in its Rule 501. The broad category of "privileges" recognized by Rule 501 makes no distinction on the basis of source or purpose. *See also* 1 Field, McKusick & Wroth, *Maine Civil Practice* § 26.13 "Scope of Discovery—Privilege" (2d ed. 1970); 8 Wright & Miller, *Federal Practice and Procedure* § 2018 (1970) (Civil Rule 26(b)(1) broadly exempts "privileged" matter from discovery).

. . . use as evidence . . . in criminal trials" does not include that evidentiary privilege which is by far the best known of all, the constitutional privilege against self-incrimination.[12] Certainly, the 1976 draftsmen of Exception B and the 1976 legislators who enacted it were not oblivious to the Fifth Amendment privilege. It is equally certain that the language they selected for Exception B brooks of no discrimination among evidentiary privileges.

In light of the precision and comprehensiveness of the language of Exception B, we do not find persuasive either of the arguments mustered by the City against a straightforward reading of Exception B. The City's semantical contention that plaintiff police officers would in any future criminal proceeding be asserting a "use immunity" rather than a "privilege," even if true, does not strike us as helpful in seeking out the legislature's intent. Whatever label might for other legal purposes be attached to the officers' right to have self-incriminating statements excluded from use as evidence in court, the root source of that right is their Fifth Amendment privilege.

The City's other argument is more substantial. From the fact that some, if not most, of the other exceptions to the required disclosure of public records are principally concerned with protection of confidential communications, the City urges that Exception B should in its context be read to refer to only privileges that serve to protect such communications, such as the husband-wife or lawyer-client privilege. It argues that Exception B should not be applied to the privilege against self-incrimination, which prohibits use of involuntary self-incriminating statements in criminal prosecutions, but which does not prohibit other public disclosure of such statements even though they may have a tendency to disgrace or publicly embarrass the speaker. *Cf. Brown v. Walker,* 161 U.S. 591, 598, 16 S.Ct. 644, 40 L.Ed. 819 (1886). There are several responses. In the first place, the language used by the legislature in Exception B itself does not contain any such ambiguity as to require or permit a court to go outside that language to seek a resolution of a problem of meaning that otherwise might remain unresolved. " 'Where the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation, and the court has no right to look for or impose another meaning.' " *Chase v. Edgar,* Me., 259 A.2d 30, 32 (1969). In any event, it is far from clear that the only purpose of the legislature in drafting and enacting these exceptions was to shield confidential communications from public disclosure. The outer limit of the purposes served by the exceptions is itself ambiguous. The legislature might well have been of the view that a statement extracted through coercive means should not be available to injure a citizen's reputation and standing in the community, any more than to convict him in court.[13] Also, it might well have believed that potential jurors should not be exposed to coerced statements that would be inadmissible in a criminal proceeding. Thus, even if we should go beyond the ordinary meaning of the language of Exception B, we are not led with any certainty to a different conclusion from that compelled by the language itself.

In construing the Freedom of Access Act we have kept steadily before us the legislature's declared purpose that to a maximum extent the public's business must be done in

12. As the Advisors' Note to Rule 501, M.R. Evid., states,
 "The most familiar constitutional privilege is the privilege against self-incrimination." Field and Murray, *Maine Evidence* 89 (1976).

13. The 1976 rewriting and codification of the Freedom of Access Act, P.L.1976, ch. 758, which includes Exception B, section 402(3)(B), also includes section 405(6), which allows public bodies or agencies to hold executive sessions, shielded from public scrutiny, to discuss such matters as the "disciplining, resignation or dismissal of . . . employees of the body or agency or the investigation or hearing of charges or complaints against persons . . . *if public discussion could be reasonably expected to cause damage to the reputation or the individual's right to privacy would be violated* . . . ." (Emphasis added)

public. The Act, we are directed, "shall be liberally construed and applied to promote its underlying purposes and policies," 1 M.R. S.A. § 401 (1978), and a corollary to such liberal construction of the Act is necessarily a strict construction of any exceptions to the required public disclosure. At the same time, in construing Exception B, we must respect the limits of proper judicial action in departing from the plain and ordinary meaning of the words selected by the legislature to define what are not to be "public records." In the graphic phrase used by Chief Justice Taft in *Yu Cong Eng v. Trinidad*, 271 U.S. 500, 518, 46 S.Ct. 619, 623, 70 L.Ed. 1059 (1926), a court must not treat a statute like "a nose of wax, to be changed from that which the plain language imports . . . ." Exception B and much of the balance of the Act were crafted in apparently careful detail by the legislature only three years ago. Policy arguments of the sort here suggested by the City—to the effect that the proper purpose of a right-to-know law is not advanced by nondisclosure of "[r]ecords that would be within the scope of [Fifth Amendment] privilege against discovery or use as evidence . . . in civil or criminal trials"—are more properly addressed to the legislature. We might well do a serious disservice to the legislature which in 1976 enacted Exception B if we should guess that it meant anything different from the normal import of the statutory language it used.

■ As explained in part II of this opinion, the entire transcript of his disciplinary interrogation, conducted under threat of "disciplinary action" for failure to answer, falls within the scope of each police officer's Fifth Amendment privilege. We read Exception B to exempt that privileged transcript from the public disclosure otherwise mandated by the Freedom of Access Act.

### IV. *The City's Obligation Under Its Collective Bargaining Agreement*

■ Through its agreement with the Police Benevolent Association, the City has committed itself to see to it that the disciplinary "interrogation of police officers . . . be conducted with the maximum amount of confidentiality possible." That contracted-for confidentiality requires more than merely closing sessions at which interrogation of police officers is conducted; it also requires protection for any transcript made of the interrogation. Interpretation of the union contract's confidentiality clause any more narrowly would render it of no practical consequence.

The public policy of the State of Maine as declared in Exception B to the Freedom of Access Act is that records within the scope of these police officers' constitutional privilege against self-incrimination need not be open to public inspection. The City points to no other legal requirement that the public be given access to the interrogation transcripts. Accordingly, it is possible for the City to decline to turn the transcripts over to the newspapers, and since possible, its union contract with the police officers takes hold to require the City to withhold the transcripts in order to achieve the promised "maximum amount of confidentiality possible." When the City contracted with the Police Benevolent Association, it apparently concluded that the public interest was best served by promising confidentiality of police disciplinary interrogation—at least where, as here, there is no supervening legal requirement of disclosure.

Until either the public policy declaration in Exception B or that represented by the confidentiality clause of the City's collective bargaining contract is changed, the City must upon the police officers' demand maintain the confidentiality of the statements they made in the disciplinary investigation of their part in the Winter Street incident.

The entry must be:

Appeal sustained.

Judgment reversed.

Remanded to the Superior Court with instructions to grant the permanent injunctive relief requested by plaintiff police officers.

WERNICK, J., did not sit.