**STATE of Maine**

v.

**Daren L. GRAVES.**

Supreme Judicial Court of Maine.

Argued Jan. 5, 1994.

Decided March 14, 1994.

Wayne S. Moss (orally), Pamela Ames, Asst. Attys. Gen., Augusta, for the State.

Edward G. Dardis (orally), Howard & Bowie, Damariscotta, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS, RUDMAN and DANA, JJ.

GLASSMAN, Justice.

Daren L. Graves appeals from a judgment entered in the Superior Court (Kennebec County, *Alexander, J.*) on a jury verdict finding him guilty of gross sexual assault, 17–A

M.R.S.A. § 253 (Supp.1993).[1] Graves contends, *inter alia,* that the trial court erred by refusing to suppress a prearrest statement he made to investigators during an interview in his supervisor's office and by refusing to admit evidence of the complaining witness's involvement in marketing and selling a T-shirt publicizing the case. Because we agree with Graves that the trial court improperly excluded evidence concerning the T-shirt, we vacate the judgment.

The record reveals that without objection the jury heard the following testimony: Graves was a police officer with the Boothbay Harbor Police Department. From November 1990 to late February 1991, the twenty-two-year-old complaining witness worked as a babysitter and resided in a house, which she rented from Graves, located approximately 500 yards from his residence. She had known Graves since June 21, 1989, when he assisted in her rescue after the car she was operating went off a bridge into forty feet of water. Prior to February 20, 1991, she had babysat for Graves's young son and the two young children of his girlfriend, all of whom resided with Graves. In February 1990, while she was caring for Graves's son .at his house, Graves had come home while on patrol, taken her into his bedroom, pushed her onto his bed, sat on her while removing her clothing, and had sexual intercourse with her. She neither reported this incident nor discussed it with anyone.

Shortly after 10:00 p.m. on February 20, 1991, Graves telephoned the complaining witness requesting that she babysit for his son while he transported an emergency care patient to Portland. She assented but requested that Graves provide transportation to his home. On reaching the Graves residence, she went to the bathroom and emerged to find Graves partially unclothed. Graves grabbed her, pinned her against a wall, began kissing her, and physically struggled with her until she was forced into his bedroom. He then ripped off her underpants, sweat pants, shoes and socks, pushed up her nightgown and sweat shirt, poured baby oil on her body, and, despite her protests, had sexual intercourse with her twice. Thereafter, she pushed him away, put on her sweat pants, shoes and socks, grabbed her jacket, and ran out of the house and back to her own home where she telephoned various friends. She reported the alleged assault to the authorities on February 22. During the course of the police investigation, the complaining witness initially denied having any previous sexual relationship with Graves.

The jury also heard further testimony that Graves and the complaining witness had an ongoing sexual relationship that began after the rescue incident in June 1989. On February 20, 1991, Graves had been in Portland where he had been drinking extensively. On his return to his.home at about 10:00 p.m. he telephoned the complaining witness to ask if she wanted to come to his home. She stated that she did and "would be right down." On her arrival, they kissed and embraced. They went into his bedroom where he removed her sweat pants, sneakers and underpants as well as his blue jeans and underwear. They engaged in consensual physical intimacies. After approximately twenty or thirty minutes, when it became apparent he could not consummate sexual intercourse, she became upset, dressed, and left the house.

On February 22, 1991, Graves received a telephone call from his supervisor, Chief Floyd McDonough, telling him to come to the police station immediately. Graves complied, and was interviewed there by Detective Richard Fairfield from the office of the Attorney General and Detective Seth Blodgett of the Lincoln County sheriff's department. Dur-

---

1. In relevant part, the statute provides:
   A person is guilty of gross sexual assault if that person engages in a sexual act with another person and:
     A. The other person submits as a result of compulsion, as defined in section 251, subsection 1, paragraph E.
   17–A M.R.S.A. § 253(1)(A) (Supp.1993).
   "Compulsion" means the use of physical force, a threat to use physical force or a combination thereof that makes a person unable to physically repel the actor or produces in that person a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon that person or another human being. "Compulsion" as defined in this paragraph places no duty upon the victim to resist the actor.
   17–A M.R.S.A. § 251(1)(E) (Supp.1993).

ing the interview, Graves first denied that the complaining witness had been at his house on the night in question. He later admitted that she had been present, but denied any sexual contact. Still later, Graves stated that he had sought to have sexual intercourse with the complaining witness and that her response was, "I'm not going to say no ... [but] I'm just going to lay here." He admitted that he had been lying to the investigators when he had initially denied any sexual contact with her and that some of his responses to the investigators had been "evasive."

Following his indictment on a charge of gross sexual assault, Graves filed a motion to change the venue of the trial and to suppress the introduction in evidence of his statement of February 22. After a hearing, the court (Lincoln County, *Bradford, J.*) granted the change of venue, but denied Graves's motion to suppress the statement.

The State made, *inter alia*, a motion *in limine* to exclude "any and all evidence of the existence of a T-shirt depicting Daren Graves" because "[a]ny inquiry into the creation, description, or sale of such a T-shirt would be improper evidence of bias and any probative value would be greatly outweighed by its prejudicial value and may lead to confusion of the jury." [2] Graves argued he was entitled to demonstrate the bias of the complaining witness as evidenced by her financial interest in the marketing, promoting or selling of the T-shirt. The court ruled that if on cross-examination the complaining witness denied any involvement in the sale or distribution of the T-shirt, Graves would not be permitted to introduce any evidence of the T-shirt absent some separate, independent evidence that the complaining witness was involved in its sale.

At the trial, on cross-examination of the complaining witness by Graves, she denied any involvement in the sale of the T-shirt. Following offer of proof by Graves without the presence of the jury, the court held that Graves could not introduce any evidence concerning the T-shirt because it was cumulative

on the issue of bias and would tend to unfairly prejudice the State's case.

From the judgment entered on the jury's verdict of guilty, Graves appeals. He does not contend that the evidence adduced at trial was insufficient to sustain the verdict, but seeks a new trial based on the challenged evidentiary rulings by the court.

I.

Graves first contends that because his statement was involuntary, the trial court erred in denying his pretrial motion to suppress the evidence of his interview with Fairfield and Blodgett. We disagree. The State bears the burden of establishing beyond a reasonable doubt that a statement made to investigators by a defendant was voluntary. *State v. Smith*, 615 A.2d 1162, 1163 (Me. 1992). "A trial court should determine whether a statement is voluntary by considering the totality of the circumstances." *Id.* "A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all the circumstances its admission would be fundamentally fair." *Id.* (quoting *State v. Mikulewicz*, 462 A.2d 497, 501 (Me. 1983)). We review for clear error a trial court's finding that the State has met its burden as to voluntariness. *State v. Smith*, 615 A.2d at 1163.

At the suppression hearing, the court heard the following evidence: Fairfield and Blodgett went to the headquarters of the Boothbay Harbor Police Department to locate Graves. In response to their inquiry, McDonough advised the investigators that Graves had the day off and then picked up a telephone and called Graves. Graves was home in bed with a cold when the telephone rang, and McDonough directed him to come to the station immediately without giving a reason. Graves complied. On seeing Fairfield and Blodgett, Graves asked, "What did I do now?," an apparent reference to a previous inquiry by the same investigators concerning Graves's conduct in a separate mat-

---

**2.** The front of the T-shirt depicted Graves in handcuffs, with a third cuff attached to his exposed and erect penis. Beside the drawing ap-

peared the words "AIN'T GETTIN OFF ... THIS TIME." Words on the back of the T-shirt read, "THEY FINALLY GOT 'THE BIG ONE'."

ter. The formal interview began shortly after 2:00 p.m. Graves testified that he did not feel at liberty to leave the interview or to decline to submit to the questioning.[3] He had, however, verbally agreed to the interview. Fairfield had advised him that he was free to leave at any time, and Chief McDonough did not tell him that his job would be in jeopardy if he did not submit to the interview.

Graves's reliance on *Moffett v. City of Portland,* 400 A.2d 340 (Me.1979) is misplaced. *Moffett* was a civil proceeding in which we agreed with a group of six police officers that they were entitled to an injunction to prevent the City of Portland from publicly releasing transcripts of statements made by the officers during an internal investigation of alleged police brutality. *Id.* at 341, 348. The case turned on whether the documents were protected from disclosure by a provision of the Freedom of Access Act, 1 M.R.S.A. § 402(3)(B) (1989 & Supp.1993) (exempting from disclosure any government records that would be within the scope of an evidentiary privilege at a civil or criminal trial). We held that the transcripts in question were protected from public disclosure by the Act in light of the officers' constitutional privilege to avoid self-incrimination. *Moffett v. City of Portland,* 400 A.2d at 345. We noted that the City of Portland had conceded that the officers' statements were involuntary. Thus the question of voluntariness was not at issue in *Moffett,* and the case offers no support for Graves' position that a statement made by a police officer in the course of a criminal investigation cannot be voluntary

because any resulting conviction would likely affect the officer's job status.[4]

In finding that Graves's statement was voluntary, the trial court noted the absence from the record of any suggestion that Graves faced suspension or, indeed, any disciplinary sanctions, had he elected not to speak with the investigators. In these circumstances it was not clear error for the trial court to find that Graves's statement to the investigators was voluntary.

## II.

Graves also contends that the trial court erroneously excluded all evidence of the T-shirt that was the subject of the State's motion *in limine.* M.R.Evid. 403 provides that a trial court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." We review evidentiary rulings for clear error or abuse of discretion, and accord "wide discretion" to the trial court's evaluation of the potential for unfair prejudice. *State v. Shuman,* 622 A.2d 716, 718 (Me.1993). When the evidence in question is proffered by a defendant in a criminal proceeding, and it is the State that is arguing that admission of the evidence would unfairly prejudice the State's case, the defendant's right to confront and cross-examine the witnesses against him[5] significantly circumscribes the court's discretion to exclude the evidence.

---

**3.** The investigators did not give Graves any warnings pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Graves does not raise this issue on appeal.

**4.** The federal cases cited by Graves are similarly unavailing. *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) involved statements concerning "ticket fixing" made by police officers in the course of an internal investigation. In *Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977), the United States Supreme Court invalidated a New York statute providing that officers in political parties who assert their privilege against self-incrimination can be turned out of office. The Court held that it is a violation of the Fifth Amendment "when a State compels testimony by

threatening to inflict potent sanctions unless the constitutional privilege is surrendered." *Id.* at 805, 97 S.Ct. at 2135. As the trial court noted in this proceeding, there is nothing in the record that suggests Graves faced job sanctions or any other official recriminations had he asserted his constitutional privilege against self-incrimination.

**5.** This right is set forth in the Sixth Amendment to the United States Constitution, guaranteeing the right of an accused in a criminal prosecution "to be confronted with the witnesses against him," as well as Article 1, Section 6 of the Maine Constitution, guaranteeing the right of the accused "[t]o be confronted by the witnesses against the accused."

The United States Supreme Court articulated this principle in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), by its holding that a state trial court had deprived a defendant of his constitutional right to confrontation when the defendant was not permitted to cross-examine a prosecution witness, critical to the identification of the defendant, as to the witness's probation status. *Id.* at 310–311, 318, 94 S.Ct. at 1107–08, 1111. The defendant's theory was that the witness's fear of probation revocation created a bias in the witness and that his evidence was not to be believed or at least carefully considered in that light. The State argued that the witness's probationary status stemmed from a juvenile conviction and asserted its interest in preserving the confidentiality of juvenile adjudications. *Id.* at 319, 94 S.Ct. at 1111–12. In reversing the conviction, the Court stressed "that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," *id.* at 316–17, 94 S.Ct. at 1110, and ruled that "defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* at 318, 94 S.Ct. at 1111. Thus exclusion of the evidence was "constitutional error of the first magnitude [that] no amount of showing of want of prejudice would cure." *Id.* (citations omitted). This right assumes particular importance when the evidence consists of testimony of a witness who might be motivated by "malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.* at 317 n. 4, 94 S.Ct. at 1110 n. 4, (*quoting Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)); *see also* Field & Murray, *Maine Evidence,* § 607.2 at 6–27 (3d ed. 1992) (noting that curtailment of a defendant's right to cross-examination on Rule 403 grounds may lead to reversal of the conviction); 3A Wigmore, *Evidence,* § 945 at 782 (Chadbourn rev. 1970) (defining bias as "*all* varieties of hostility or prejudice against the opponent" (emphasis added)); *but see State v. Larrabee,* 377 A.2d 463, 467 (Me.1977) (the right described in *Davis* does not guarantee admission in evidence of all material of an impeaching nature).

In this case, pursuant to the explicit pretrial instructions of the court, Graves asked the complaining witness during cross-examination whether she had "sold or been involved in the sale of any T-shirts that depict or show this incident," but did not attempt to impeach her directly when she responded to the inquiry in the negative. As an offer of proof, Graves presented Jerry Martin, who testified that he was related to the complaining witness and her family by marriage. He stated that the complaining witness's mother had approached him in July of 1991 outside a store in Boothbay Harbor to ask if he were interested in purchasing the T-shirt in question. Martin went to the home of the witness and her mother some time later to see the shirt and was told by the witness that they were temporarily out of stock. He further testified that the witness eventually called him to advise him that his T-shirt had arrived, and he went to her home to pick it up. When he arrived, she handed him a T-shirt, made a comment about Graves's sexual characteristics as depicted in the drawing, and accepted the payment of twenty dollars for the T-shirt. Her mother handed him a receipt for the payment. Martin did not know who was actually producing the T-shirts.

Describing the T-shirt and the involvement of the complaining witness with its sale and distribution as "cumulative bias evidence," the court stated there was insufficient evidence offered by Graves to show that she was engaged in a large economic scheme to make a great deal of profit from the sale of the T-shirts. The court determined that it was "far more prejudicial than probative in the circumstances of this case where there is plenty of other evidence that animosity exists" between the complaining witness and Graves. Thus, the trial court excluded any evidence concerning the T-shirt. The State argues this was proper because the complaining witness had already admitted her extreme dislike for Graves. It is clear, however, that the evidence of the complaining witness's involvement in the sale of the T-shirts

could demonstrate a bias against Graves distinct from her dislike of him.

We conclude that evidence linking the complaining witness to the marketing and sale of the T-shirt depicting Graves and hostility toward him is functionally indistinguishable from the evidence improperly excluded in *Davis.* The pecuniary interest and motivation of a complaining witness is a proper subject for jury consideration. Because we cannot say beyond a reasonable doubt that the exclusion of this evidence did not affect the verdict, the error is not harmless and we vacate the judgment. *See State v. Anaya,* 438 A.2d 892, 894 (Me.1981). Accordingly, we need not address the remaining issues raised by Graves in this appeal.

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.