LIONTI, Filippo and Lionti, Carmela, husband and wife, and Route 202 Corporation trading as Lionti's Villa

v.

LLOYD'S INSURANCE COMPANY and Dominion Insurance Company, Berkley Charles Berkley-Portman, Excess Insurance Company, Bellefonte Insurance Company, and Dominion Insurance Company, Edinburgh, Scotland.

Appeal of Filippo LIONTI and Carmela Lionti, husband and wife, Route 202 Corporation t/a Lionti's Villa and/or The Italian Villa.

No. 81–1659.

United States Court of Appeals, Third Circuit.

Argued Dec. 16, 1982.

Decided June 10, 1983.

Rehearing Denied July 7, 1983.

Nelson J. Sack (argued), Media, Pa., for appellants.

David R. Strawbridge (argued), Cozen, Begier & O'Connor, Philadelphia, Pa., for appellees.

Before HUNTER and GARTH, Circuit Judges, and STERN, District Judge.*

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal presents for our review two claimed evidentiary errors which occurred during a thirteen-day trial. The plaintiffs Filippo and Carmela Lionti ("Lionti") contend that these two alleged errors should

result in the grant of a new trial. We cannot agree.

On September 20, 1978, The Italian Villa, a restaurant and bar owned by Lionti, burned to the ground. Lionti brought this action against his insurer [1] after the insurer disallowed his claim for policy proceeds. The insurer refused Lionti's claim on the ground that Lionti set or procured the setting of the fire. The jury returned a verdict in favor of the insurance company. Lionti appeals from an order of the district court denying his motion for a new trial.[2] Because we find no error affecting a substantial right of the parties, we affirm.

### I.

The Italian Villa was a single story stone structure with a full basement containing a restaurant and bar. At roughly 5:00 a.m. on September 20, 1978, a violent explosion erupted in the building, shattering windows in a house nearby and catapulting debris over 100 feet away.

On November 16, Lionti submitted proofs of loss to his insurance company. These proofs of loss asserted losses of $266,606 for the building itself, $114,256 for its contents, $83,850 for interruptions of business income, and affirmed that the origin of the fire was "unknown to assured." Lionti initiated this action on June 6, 1979, claiming that the insurer had not reimbursed Lionti for the losses sustained, although the insurer had paid Lionti's mortgagee, the First Mortgage Company of Pennsylvania, $180,000 under the policy's loss-payable clause. On September 21 the insurer counterclaimed against Lionti for $180,000, the loss

---

* Honorable Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation.

1. The defendants Charles Berkley-Portman, representing a number of individual insurers known colloquially as Lloyd's of London, and the Dominion Insurance Co., issued policies of insurance covering the property which the parties stipulate were "in full force and effect subject to all [their] terms and conditions" at the time of the loss. The defendants are identified hereinafter as the "insurer" or "insurance company."

2. Although the order of the district court from which Lionti appeals denies Lionti's motion both for a new trial and for judgment notwithstanding the verdict, the record does not disclose a motion for directed verdict at the close of the evidence. The denial of Lionti's motion for judgment notwithstanding the verdict is therefore not before us. Fed.R.Civ.P. 50(b); see *Lowenstein v. Pepsi-Cola Bottling Co.*, 536 F.2d 9, 10–12 (3d Cir.), *cert. denied,* 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976).

paid to First Mortgage, as subrogees of First Mortgage's rights. The case proceeded to trial on February 13, 1980.

### A.

Evidence adduced at trial was overwhelming that the September 20 fire had been set intentionally. Firemen entering the structure found gasoline vapors in the basement so strong that they were unable to remain in the building. Burn patterns on the floor of the restaurant indicated that the fire had been spread by a flammable liquid. Inside the restaurant's kitchen door lay an extension cord plugged into a wall outlet and terminating in an electric charcoal lighter; lying beneath the charcoal lighter were two plastic containers smelling of gasoline. Firefighters removed from the building these two containers and three others; laboratory tests proved at least four of these five containers to contain gasoline. Carpeting and debris throughout the restaurant were also impregnated with gasoline. In the opinion of several experts, the magnitude of the explosion, the residue of gasoline and location of gasoline containers, and the presence of an electric starter coil left little doubt that the fire was of incendiary origin.

Evidence that Lionti was responsible for the fire was also compelling, although largely circumstantial. The evidence of Lionti's complicity fell into three categories.

First, testimony indicated that the Italian Villa was financially troubled during the months before the fire. Sales during the month of August, 1978, were $16,324, substantially less than the August 1977 sales of $25,586. Sales during the nine months preceding the fire were only $133,000, again considerably less than the prior nine months' sales of $217,000. Based on Lionti's corporate 1978 tax return, an expert estimated Lionti's yearly expenses at $84,000; Lionti had available cash, however, of only $58,000, resulting in a cash flow shortage of $26,000. Nine checks issued by Gina Lionti, daughter of Filippo and Carmela, in August and September of 1978 were returned for insufficient funds. By August of 1978, the Italian Villa had fallen behind in payments to at least seven creditors, including three banks or savings and loan associations. Real estate, sales, and payroll taxes for the 1977 tax year were all delinquent.

Second, nine days before the fire, the First Mortgage Company of Pennsylvania notified Lionti that First Mortgage intended to call in a loan of $392,000 and foreclose on its security interests, including the restaurant and Lionti's liquor license. Five days before the fire, Lionti entered into an oral agreement with First Mortgage stipulating that the restaurant would be put up for sale by September 25, and would be sold within ninety days thereafter. On Tuesday, September 19, Lionti was to sign documents memorializing this agreement. No agreement was ever signed. On Wednesday, September 20, the Italian Villa burned to the ground.

Third, several arrangements concerning Lionti's insurance raise strong inferences of Lionti's involvement in the September 20 fire. On September 12—one day after First Mortgage notified Lionti of its intention to foreclose—Gaetano Lionti, son of Filippo and Carmela, approached an insurance agent and sought to purchase an additional $500,000 of fire insurance for the restaurant. After the fire, the agent reported this solicitation to the Pennsylvania fire marshal on his own accord. Asked why he approached the fire marshal, the agent explained, "Well, it's rather unusual when somebody requests a large amount of fire insurance in addition to what they may already have and then a couple of days later there is a fire." In addition, on September 14, Gina Lionti appeared in the office of Lionti's insurance agent and—for the first time in a two-year history of delinquent payments—prepaid three months' insurance premiums in advance of the date payment was due.

In the opinion of the insurer's expert, these facts, coupled with the absence of any indication of forcible entry, evidence that only Lionti had keys to the building and the alarm system, the early morning hour of

the fire, and the absence of indicators that the fire had been set for revenge, fell "into a classic pattern of an insurance fraud fire."

For his part, Lionti maintained that the fire harmed rather than assisted him financially, suggesting an absence of motive,[3] and implied that the insurer colluded with First Mortgage to recover from Lionti, moneys that the insurer owed First Mortgage as a loss mortgage payee named in the policies.[4] In addition, Lionti suggested that a disgruntled employee, Brice McLane, may have ignited the fire in revenge for his discharge from employment. The issues presented by this appeal arise principally as a consequence of McLane's testimony.

### B.

McLane had been hired by Lionti in July or August of 1978 to promote business. After several disputes with McLane over a bartender, McLane was paid $300 for his services and was discharged. The district court permitted Gina Lionti to testify to several declarations of McLane suggesting a motive of revenge. According to Gina, McLane stated, "No, she [the bartender] don't go. She's got to stay here.... Things are going my way, otherwise I will blow up the whole place with dynamite."

In order to rebut the inference that McLane, and not Lionti, started the fire the insurer called McLane to testify. Asked whether McLane recalled an argument or discussion with Gina Lionti during the summer of 1978, McLane asserted the fifth amendment privilege against self-incrimination. Nevertheless, taking what counsel for the insurer, David Strawbridge, characterized during oral argument as "a calculated risk," Strawbridge pressed on with additional questions. McLane denied threatening to harm Lionti or to burn, dynamite, or destroy the restaurant. However, in answer to the following question—"Did you have anything to do with setting the fire, Mr. McLane?"—McLane responded, "I refuse to answer that question on the grounds it may tend to incriminate me."[5]

Strawbridge immediately approached the bench and informed the court that only an hour or so earlier, McLane had told Strawbridge and the insurer's investigator, William Miller, that McLane "did not have anything to do with the setting of the fire." Strawbridge consequently sought a ruling that McLane be compelled to answer. Accordingly, the district court excused the jury and conducted a hearing on the admissibility of McLane's testimony.

McLane proceeded to confirm that he told Strawbridge and the investigator, Miller,

**3.** Lionti's loan agreement with First Mortgage included a prepayment penalty clause. According to Edward Sicles, president of First Mortgage, the settlement between First Mortgage and the insurer constituted a "prepayment" exposing Lionti to a prepayment penalty. In addition, Lionti's proofs of loss for those claims respecting the contents of the building and business interruption exceeded the policy limits of $50,000.

**4.** On April 12, 1979, the insurer and First Mortgage executed a "release and agreement of assignment," according to which the insurer agreed to pay First Mortgage $180,000 under the policy's loss-payable clause. This payment formed the basis for the insurer's counterclaim against Lionti. First Mortgage, in turn, released the insurer from all claims due under the policy. The agreement recited that First Mortgage "intends to exercise its rights of foreclosure"; the agreement also included a formula permitting the insurer to share in moneys obtained by First Mortgage as the result of a

foreclosure. Because First Mortgage held security interests in properties other than the restaurant, and because Lionti owed First Mortgage considerably more than $180,000, First Mortgage anticipated foreclosing on additional property. The insurer, in turn, anticipated sharing in this income, and thereby recouping some, if not all, of the $180,000 paid over to First Mortgage. Lionti hoped the jury would draw an inference that as a result of a sweetheart deal between the insurer and First Mortgage, the insurer had nothing to lose, and much to gain, by disclaiming liability.

**5.** McLane testified that he had retained counsel in Delaware who "was not available to come with me today on such short notice," and who had advised McLane to "take the Fifth Amendment on any questions concerning my involvement in the fire." McLane informed the court that he had been arrested for charges growing out of the fire and was under investigation by the Treasury Department for possible involvement in the fire.

that McLane was not involved in the fire. The court thereupon ruled that the insurer would be permitted to plead surprise and impeach the inference drawn from McLane's assertion of the fifth amendment privilege. In particular, the court ruled that McLane could be asked whether, within the previous hour, McLane told Strawbridge and Miller that he, McLane, had nothing to do with the fire. If McLane answered this question in the affirmative, the court ruled, McLane could then be asked whether this prior statement was true. Finally, the court ruled that McLane had not waived the fifth amendment privilege by virtue of any statements made to Strawbridge and Miller.

Still out of the presence of the jury, Strawbridge asked the questions authorized by the court. McLane confirmed that he told Strawbridge and Miller several hours earlier that he, McLane "had nothing to do with the fire." Strawbridge thereafter proposed to question McLane along these lines in the presence of the jury. The court agreed, but directed counsel "not to ask [McLane] questions where he has said he will invoke his privilege."

Before the jury, McLane again denied threatening Lionti. Strawbridge then asked whether McLane recalled "me asking you if you were in any way connected with the fire, involved with the fire." McLane responded, "I refuse to answer on the grounds it would tend to incriminate me." Strawbridge did not ask the court to compel an answer to this question.

Thus thwarted in his desire to impeach McLane by eliciting from McLane a prior statement inconsistent with McLane's reasserted privilege against self-incrimination, Strawbridge called the investigator, Miller, to the stand. Counsel for Lionti objected to Miller's testimony in total.[6] During a hearing on the admissibility of Miller's testimony, Miller related that McLane told Miller that McLane had been approached by Gaetano Lionti with questions concerning how

one would set a fire. According to Miller, McLane reported that he had sketched on a napkin the plan for a fire that "could cause the total destruction of the building." Miller also proposed to recite the contents of McLane's remarks made in the corridor to the effect that McLane had nothing to do with the fire, and proposed to testify that McLane sought to obtain money in exchange for favorable testimony first from the insurer, and then from Lionti.

At the conclusion of Miller's voir dire, the court permitted Miller to testify only for the purpose of "impeach[ing] statements made by Mr. McLane that would be inconsistent with statements he made to Mr. Miller." Before the jury, Miller testified to McLane's remarks in the corridor to the effect that McLane was not involved in the commission of the fire. Strawbridge offered Miller's account of McLane's remarks not for the truth of the matter asserted, but for the fact that McLane made them and that they were inconsistent with McLane's subsequent assertion of the fifth amendment privilege.

Miller also testified to two other out-of-court declarations of McLane. Asked what McLane told Miller "with respect to his interest in compensation [from the insurers] as concerned his testimony," Miller replied:

He indicated to me that he had information concerning the cause and origin of the fire and he had information concerning questions that had been brought to him by members of the Lionti family concerning the fire, concerning how someone would set a fire.

The court sustained Lionti's objection to this answer, granted Lionti's motion to strike, and instructed the jury "to disregard it."

Asked about McLane's offer to Lionti to give favorable testimony in exchange for money, Miller began to relate that McLane stated he had information that would "wrap the case up for the insurance compa-

---

6. Counsel objected as follows:

    MR. SEIGLE: Your Honor, do I object on the record at this point? Because, you know,

I object to the whole line of testimony of this witness with respect to his testimony as against the witness yesterday, Brice McLane.

ny." Before Miller could utter the words "wrap the case up for the insurance company," the court admonished Miller to stop speaking. Nevertheless, the court later permitted Miller to testify, over Lionti's objection, to McLane's assertion that McLane's information would "wrap the case up for the insurance company and the Liontis were not dumb and they would be willing to make a deal." The court did not, however, permit Miller to relate the *substance* of the information that, in McLane's words, would "wrap the case up for the insurance company."

At the conclusion of Miller's testimony, the court instructed the jury that Miller's testimony could be used only to impeach McLane's credibility, an instruction reiterated during the court's charge to the jury.[7] The district court also charged that McLane's assertion of the privilege against self-incrimination "is to have no evidentiary value at all." *See* note 9 *infra.*

The jury returned a verdict in favor of the insurance company. The court denied Lionti's subsequent motion for a new trial or for a judgment notwithstanding the verdict, noting that "[a]lthough the defendants' case relied exclusively on circumstantial evidence, it was of more than sufficient volume and weight to justify the finding that the Liontis had set the fire or caused it to be set."

## II.

Lionti's brief on appeal raises only two issues. Both concern Miller's testimony. Neither concerns McLane's assertion of his fifth amendment privilege.[8] First, Lionti seeks a new trial based on Miller's account

of McLane's statement that questions "had been brought to [McLane] by members of the Lionti family concerning . . . how someone would set a fire." The district court granted Lionti's belated objection and motion to strike. Nevertheless, Lionti argues that the court's instruction to disregard this statement did not purge the trial of prejudice.

Second, Lionti maintains that Miller's recitation that McLane had evidence that would "wrap the case up for the insurance company," and for which Lionti "would be willing to make a deal," requires a new trial. The clear inference, Lionti asserts, "is that the Liontis would pay McLane to keep quiet because the Liontis had started the fire" (Appellants' Brief, at 13–14). Lionti argues that by so testifying, Miller violated the district court's admonition not to disclose the contents of the information McLane possessed that would "wrap the case up for the insurance company." In addition, Lionti claims that McLane's outburst in this respect requires a new trial.

## III.

We need dwell only briefly on Miller's account of McLane's offers to "sell" favorable testimony. As Lionti properly observes, the first of Miller's contested statements—relating McLane's out-of-court declaration that Lionti approached McLane with questions "concerning how someone would set a fire"—was hearsay. Because the district court granted Lionti's motion to strike and instructed the jury to disregard this statement, we must ask whether Miller's statement was so prejudicial as to require a new trial.

**7.** The district court charged as follows:
[Y]ou are not to use anything that William Miller said about his prior conversation with Brice McLane to establish what Brice McLane actually said, or to establish any fact for one side or the other. The only purpose for Mr. Miller's testimony was that of discrediting Brice McLane as a witness, if in fact you think that it did discredit him.

**8.** Although in text we have set forth, in some detail, the evidentiary development giving rise to the two claims of error now asserted by

Lionti, we have done so only to place Miller's testimony, challenged by Lionti, in its proper context. Thus, it must be remembered that despite the evidentiary setting which resulted in Miller's testimony, Lionti in this appeal has never asserted any error based on McLane's claim of a fifth amendment privilege. Indeed, while Lionti advanced an argument on this point to the district court in a post-trial motion, it has evidently been abandoned on appeal. Our disposition of this appeal makes it unnecessary to address this issue. *See* note 10 *infra.*

"The general rule is that if evidence which may have been taken in the course of a trial, be withdrawn from the consideration of the jury by the direction of the presiding judge, that such direction cures any error which may have been committed by its introduction." *Throckmorton v. Holt,* 180 U.S. 552, 567, 21 S.Ct. 474, 480, 45 L.Ed. 663 (1901). In addition, we are instructed by Fed.R.Civ.P. 61, and by 28 U.S.C. § 2111 (1976), that no error or defect shall be ground for granting a new trial "unless refusal to take such action appears to the court inconsistent with substantial justice." *See Mercer v. Theriot,* 377 U.S. 152, 154, 84 S.Ct. 1157, 1159, 12 L.Ed.2d 206 (1964) (per curiam); *Warrick v. Brode,* 428 F.2d 699 (3d Cir.1970) (per curiam).

The district court found that evidence of Lionti's complicity in the fire was, although largely circumstantial, "overwhelming," App. at 162, and we cannot disagree. Evidence that Lionti sought to purchase an additional $500,000 of fire insurance nine days before the fire and one day after First Mortgage communicated its intention to foreclose, and that Gina Lionti, for the first time in two years (and six days before the fire), tendered an insurance premium before it was due, was more than ample to link Lionti to the fire. We are satisfied that this single unresponsive outburst by Miller, in the context of a thirteen-day trial, followed immediately by the court's curative instruction, did not affect the jury's verdict.

Miller's second statement—recounting McLane's suggestion that McLane had information that would "wrap the case up for the insurance company"—is charged by Lionti to violate the district court's earlier ruling not to disclose the substance of McLane's remarks, and to be so prejudicial that reversal of the jury verdict is required. First, our reading of the record discloses that the district court's admonition was not breached. Miller did not reveal the substance of McLane's information that would "wrap the case up for the insurance company."

Second, in order to appreciate the context in which this statement was made, it must be remembered that the insurance company had called McLane as a witness to testify that he, McLane, had stated to Miller that McLane "did not have anything to do with the setting of the fire." McLane, however, had remained silent, and the district court did not compel him to testify. In its final instruction to the jury, the court instructed that McLane's "exercise of his constitutional privilege [had] no evidentiary value at all." [9]

Thus, to the extent that the district court removed from the jury's consideration McLane's claim of privilege, Miller's testimony as to what McLane had told him— that McLane "did not have anything to do with the setting of the fire"—was hearsay.

In light, however, of the overwhelming evidence adduced during trial, we are satisfied that Miller's statement, while erroneously admitted, was harmless. *See* Fed.R. Evid. 103(a).[10] While the court admitted Miller's testimony erroneously in this one respect, it was not error to admit Miller's testimony which related to McLane's eagerness to "sell" information first to the insurance company, and then to Lionti. McLane's willingness to sell his information was available for legitimate consideration by the jury in assessing his credibility.

**9.** The district court charged as follows:
There is one more thing you should bear in mind with regard to this particular witness Brice McLane. He exercised his privilege against self-incrimination. That was his right and you are not to infer anything adverse to either the plaintiffs or anything adverse to the defendants by reason of what Brice McLane did. There may very well be a myriad of reasons why he would choose to exercise his privilege against self-incrimination, and it would be improper for you to make any assumption or to try to guess or to surmise or puzzle out why he chose to exercise that privilege. Accordingly, you are directed that Brice McLane's exercise of his constitutional privilege is to have no evidentiary value at all.

**10.** Thus, contrary to the dissent's argument, we do not address the issue whether McLane's exercise of a fifth amendment privilege has evidential value.

Thus, we find no error in the admission of this segment of Miller's testimony. Furthermore, we are satisfied that even were it otherwise, Miller's later testimony, even in combination with his earlier one-sentence outburst, would constitute harmless error under the standard previously addressed, and would therefore be insufficient to warrant a new trial.

## IV.

The March 6, 1981 order of the district court will be affirmed.

STERN, District Judge, dissenting.

Whether there is evidential value in a non-party witness's invocation of fifth amendment privilege in a civil case is an issue no court of appeals has ever squarely addressed. Today the majority makes a muscular attempt to avoid being the first to speak. Despite its insistence on non-decision, however, the majority implicitly answers the question affirmatively. I am therefore unable to join its decision.

The trial court ruled that McLane's assertion of fifth amendment privilege was proper, and then permitted the insurance company to call Miller, its own agent, as a collateral witness for the sole purpose of "impeaching" McLane's invocation of privilege.[1] Counsel for the insurance company readily admitted at oral argument that Miller was called in order to impeach McLane's refusal to testify, and the majority notes that Miller's testimony was offered "not for the truth of the matter asserted, but for the fact that McLane made [the statements] and that they were inconsistent with McLane's subsequent assertion of the fifth amendment privilege."[2] Maj. op. at 241.

A few days later, the trial court reversed itself in its charge to the jury, and instructed that the assertion of the fifth amendment has no evidential worth. See Maj. op. at 243 n. 9. In spite of the fact that the trial court thus made rulings flatly inconsistent with each other as to the evidential content of the invocation of the fifth amendment, the majority insists that it is not necessary to resolve this confusion. Instead, the majority professes to limit its holding by stating that it is not ruling on the fifth amendment evidential question, but only on the error produced by allowing portions of Miller's testimony on a basis inconsistent with subsequent jury instructions.

There can be no dispute that the trial court either committed error in originally permitting the inference and its rebuttal, or that it committed error in ruling in its final instruction that no inference can be drawn. It cannot be right as to each. The majority's refusal to say which is correct authorizes both, and hereafter leaves to the trial court's discretion the decision whether or not to allow an inference to be taken from a non-party witness's invocation of fifth amendment privilege.[3] In my view, this is

---

1. The court ruled that impeachment of McLane was proper in order to "negative[ ] the unfavorable inference [McLane] may have created by his refusal to testify," App. at 54, and stated that "the only purpose of [Miller's] testimony is to impeach any inference that might have been drawn from Mr. McLane's testimony." App. at 86–87. It should also be emphasized that the circumstances leading to the invocation from which the allowed inference was drawn were entirely of defendant's creation. Very early in his direct examination, in response to a question concerning only a conversation between Gina Lionti and him, McLane invoked a fifth amendment privilege. Defendant's counsel, on notice that McLane was asserting a privilege, persisted nonetheless with his questioning, taking, in his own words, "a calculated risk." The ultimate result of this gamble was that defendant was able to introduce otherwise inadmissi-

ble testimony, highly damaging to plaintiff, which, rather than "impeaching" of McLane's invocation of the fifth amendment, vindicated its propriety.

2. While it is true that McLane did answer a few questions, it is plain that none of these responses were in any way harmful to the insurance company, thus confirming that the only purposes for allowing Miller to testify was to impeach what the trial court initially believed was a permissible negative inference to be drawn from McLane's invocation of the fifth amendment.

3. The majority's conclusion that portions of Miller's testimony were admissible, see Maj. op. at 244, further reveals its implicit holding, for as discussed earlier, the sole purpose of Miller's entire testimony was to impeach McLane's invo-

grave error for two reasons: it transposes the determination as to the propriety of invoking privilege from judge to jury, and it imparts evidential value to the assertion of the fifth amendment.

In general, the invocation of the fifth amendment privilege is without evidential content. Certainly in the criminal setting this is so, where it is understood that,

> The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury. As we pointed out in *Ullmann* [*v. United States,* 350 U.S. 422, 426–29, 76 S.Ct. 497, 500–01, 100 L.Ed. 511 (1956)], a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances.

*Slochower v. Board of Higher Education,* 350 U.S. 551, 557–58, 76 S.Ct. 637, 640–41, 100 L.Ed. 692 (1956) (citing Griswold, The Fifth Amendment Today (1955)). *Accord Grunewald v. United States,* 353 U.S. 391, 421, 77 S.Ct. 963, 982, 1 L.Ed.2d 931 (1957). This follows from the fact that in order to invoke the privilege it is only necessary that from the question *alone* it is not possible to say that an answer would not incriminate or even furnish a "link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818,

95 L.Ed. 1118 (1951) (citing *Blau v. United States,* 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950)). *Accord United States v. Lowell,* 649 F.2d 950, 963–64 (3d Cir.1981) (citing *United States v. Burr,* 25 F.Cas. 38 (C.C.D.Va.1807) (No. 14,692e) (Marshall, C.J.), where "link in the chain" test first announced); *United States v. Coffey,* 198 F.2d 438, 440 (3d Cir.1952). Since the judge must determine the propriety of the invocation from the question alone, it is impossible to make meaningful inferences from the invocation of this privilege. The judge must act blindly; he may not speculate or infer what the actual answer is. His ruling permitting the refusal to testify cannot authorize a jury to infer what the answer might have been. In the setting of a courtroom, a witness may have many reasons for refusing to give testimony. Under the fifth amendment test, once a witness invokes privilege it is nigh to impossible to determine why he has done so, or to overrule his refusal. Just as courts can never be comfortable that in upholding the invocation they truly vindicate the privilege, juries are left with nothing but rank speculation in attempting to draw inferences from such an event.

In only one limited context have courts accorded the refusal to testify with evidential import: the invocation of the fifth amendment by parties in civil litigation. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976).[4]

---

cation of the fifth amendment. Unless this impeachment is proper, all of Miller's testimony was erroneously admitted.

4. *Baxter* does not refer to non-party *witnesses* in civil actions, and the sole authority cited by the Court in authorizing inferences as to parties explicitly states that inferences are not to be taken from a witness's assertion of fifth amendment privilege. 8 Wigmore, Evidence § 2272, at 437 (McNaughton rev. 1961). Commentators have ratified Wigmore's distinction between the invocation of fifth amendment privilege by a witness as opposed to a party, *see, e.g.,* Morrison, Commentary: Availability of Fifth Amendment Privilege Against Self-Incrimination and the Permissibility of Drawing Adverse Inferences: Alternative Perspectives, 48 A.B.A. Antitrust L.J. 1421 (1980); Moxham, A Comment Upon the Effect of Exercise of

One's Fifth Amendment Privilege in Civil Litigation, 12 New Eng.L.Rev. 265 (1976); Note, Use of the Privilege Against Self-Incrimination in Civil Litigation, 52 Va.L.Rev. 322 (1966); Ratner, Consequences of Exercising the Privilege Against Self-Incrimination, 25 U.Chi.L. Rev. 472 (1957), and I am aware of no other appellate court that before today has extended *Baxter's* ruling to include witnesses. While several district court opinions indicate that inferences may be drawn from a witness's invocation of the fifth amendment, *e.g., Brink's, Inc. v. City of New York,* 539 F.Supp. 1139, 1141–42 (S.D.N.Y.1982); *E.H. Boerth Co. v. LAD Properties,* 82 F.R.D. 635, 644–45 (D.Minn.1979); *Poplar Grove Planting and Refining Co. v. Bache Halsey Stuart Inc.,* 465 F.Supp. 585, 591 (M.D.La.1979), to the extent that these decisions simply extend to witnesses prevailing rules concerning civil parties, without further

The reasoning behind this exception, although less than satisfying, would appear to be that this is a necessary toll exacted from civil litigants who might otherwise use the privilege as a weapon against the opposing side. Allowing inferences to be drawn from a party's invocation of the fifth amendment is, in this view, a transaction cost of litigation whose potential harshness is mitigated by the ability of a party, through counsel, to explain and control the contours of his invocation. *See, e.g.,* Heidt, The Conjurer's Circle: The Fifth Amendment Privilege in Civil Cases, 91 Yale L.J. 1062 (1982); Note, Plaintiff as Deponent: Invoking the Fifth Amendment, 48 U.Chi.L. Rev. 158 (1981); Daskal, Assertion of the Constitutional Privilege Against Self-Incrimination in Federal Civil Litigation: Rights and Remedies, 64 Marq.L.Rev. 243 (1980); Kaminsky, Preventing Unfair Use of the Privilege Against Self-Incrimination in Private Civil Litigation: A Critical Analysis, 39 Brooklyn L.Rev. 121 (1972); Ratner, *supra* at 245 n. 4.[5]

To the extent that these concerns exist where parties are involved, none are implicated when a mere witness, with no stake in the matter, invokes privilege. Provided that such behavior is not the responsibility of either party, it does not work any unfair-

ness which requires penalization. To the contrary, it is by allowing inferences from a witness's refusal to testify that one party will be harmed, and in a manner that is beyond his power to control. While a party may be able to deflect the damage of adverse inferences taken from his own invocation through, for example, rehabilitating examination by his counsel, he is unable to defend against an adverse inference drawn against a witness which in turn harms his own case.

If we extend *Baxter* to include civil witnesses, we thereby approve of trial tactics I had until today thought impermissible. If the invocation of the fifth amendment is an evidential event, nothing prevents a civil party, or for that matter a criminal defendant, from calling a witness to the stand, with the sole and express purpose of having the jury hear the witness invoke a fifth amendment privilege and draw an inference. This practice has been condemned, however, with respect to calling of witnesses by criminal defendants, *see, e.g., United States v. Lacouture,* 495 F.2d 1237, 1240 (5th Cir.) (quoting *United States v. Johnson,* 488 F.2d 1206, 1211 (1st Cir.1973)), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974); *Bowles v. United States,* 439 F.2d 536, 542 (D.C.Cir.1970) (*en*

---

analysis, they are subject to the same criticism I offer with respect to the majority opinion today.

**5.** This reasoning, allowing a distinction to be drawn between criminal and civil cases, is far from compelling, and I would reject this schizophrenic approach. *See* Proposed Rule 513, Fed.R.Evid., 56 F.R.D. 183, 260 (1973) (no inference to be drawn from invocation of privilege) (rejected by Congress on unrelated grounds, *see* 2 Weinstein's Evidence § 501[01][–02] (1981)). Even *Baxter's* sole authority suggests that the cases establishing the allowance of an inference from a party in a civil matter are "confused." 8 Wigmore, Evidence § 2272, at 437 & n. 9 (McNaughton rev. 1961). If institutional concerns exist in the civil context incongruent with the assertion of the privilege by parties, it would seem that other corrective measures exist which do not create analytic distortion. It makes as much sense to charge a party $5 for each invocation by him as to charge him with an adverse inference on each occasion. If the object is merely to make the

invocation costly, or to recompense the adversary, then a toll is as intellectually gratifying as an unreasonable inference. On the other hand, it does make sense, for example, to prohibit direct testimony from a party unwilling to answer relevant questions on cross examination. That approach is not designed to be a penalty, but prevents the fifth amendment from being used for unfair advantage.

That *Baxter's* holding is troublesome is further evidenced by the Court's distinguishing of *Baxter* from *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and the line of cases that follows. The latter cases bar the imposition of sanctions where the only basis for penalization is the invocation of fifth amendment privilege in the absence of other evidence. In their allowance of inferences to be drawn against civil parties, I read *Baxter* and *Lefkowitz v. Cunningham,* 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977), to say that such inferences, while clearly costly, are acceptable until they become too costly. I remain unconvinced that the fifth amendment tolerates such flimsy construction.

*banc*), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971), and I see no distinction as applied to civil parties. *See also* American Bar Association Project on Standards for Criminal Justice, Standard 4–7.6(c) (a lawyer should not call a witness who he knows will claim a valid privilege not to testify). Moreover, in certain instances such as that before us, the majority's implicit holding would permit the jury, rather than the judge, to determine the propriety of the invocation itself. In this case, for example, the trial court initially—and erroneously—considered that the jury could legally draw an inference that McLane had set the fire from McLane's invocation of privilege. Then, in permitting the defense to negate this inference with Miller's testimony, the court allowed the jury to retry the issue of the propriety of the invocation itself. It thus shifted the final responsibility for determining the propriety of the invocation from court to jury. There can be no doubt that this displacement of functions is impermissible. What the court should have done when McLane refused to answer was immediately to give the instruction it reserved for the end: that the jury should disregard McLane's invocation because it possessed no evidential worth.

The trial court's decision to admit Miller's testimony, inconsistent with its own belated instruction as well as articulate fifth amendment analysis, was error. Had the majority admitted the source of this error, but held that error harmless, there would be no occasion for disagreement. But an appellate holding that invites future juries to weigh the evidential worth of fifth amendment invocations, and that authorizes future advocates to call witnesses for the value in their refusals to testify, compels this dissent.