Bill E. SAWYER, et al., Plaintiffs,

v.

STATE OF ALABAMA, et al., Defendants.

Civ. A. No. 85-0948-AH.

United States District Court, S.D. Alabama, S.D.

July 29, 1988.

Roderick P. Stout, James B. Rossler, Barry Hess, William B. Jackson, II, Mobile, Ala., for plaintiffs.

David Christy, Asst. Atty. Gen., Montgomery, Ala., for state of Ala.

R. Frank Ussery, State Personnel Bd., Montgomery, Ala., for Alabama State Personnel Bd., Halycon V. Ballard, Mureal Crump, C.W. (Woody) Anderson, Norman Figures, Ann Rutherford and Andrew J. Gentry, Jr.

G. Sage Lyons, Charles L. Miller, Jr., Mobile, Ala., for Robert M. Hope.

James V. Roberts, Larry U. Sims, Mobile, Ala., for Donald G. Valeska, II.

Michael D. Knight, Kelly D. Reese, Mobile, Ala., for Mark G. Montiel and Harry Kearley.

## ORDER

HOWARD, District Judge.

This cause is before the Court on cross-motions for summary judgment and for partial summary judgment filed, in chronological order, by defendant Valeska, defendant Monteil, plaintiffs, defendant Hope, defendant Alabama State Personnel Board, and defendant Kearley. (Tabs ## 122, 131, 138, 139, 140, 141.)

The motions have been filed with the agreement of the parties that "the sole issue to be determined by the Court on the Index of Stipulated Record and the Motions previously described is whether or not in conjunction with their termination from the Alabama State Docks the Plaintiffs' rights under the Fifth Amendment of the Constitution of the United States were violated." (Joint Understanding and Waiver of Rules, Tab # 142.) The parties also have "stipulate[d] for purposes of summary judgment" that a collection of fifteen documents and exhibits "constitute[s] the record." (Amended Index of Stipulated Record on Summary Judgment, Tab # 147.)

The Court has accordingly limited the evidence and arguments considered.[1]

Plaintiffs were employees of the Alabama State Docks in 1985, when a Mobile County grand jury was investigating possible illegal activities at the Docks, including those of one John Britain. Plaintiffs were called to testify at the May 1985 session of the grand jury, but pleaded the Fifth Amendment. They were called again to testify at the June 1985 session of the grand jury and again pleaded the Fifth Amendment. They were fired about two weeks later.

The starting point for the parties' discussion of their motions is the Court's order of July 20, 1987, which is attached to this order as Appendix 1. In the course of denying cross-motions for summary judgment, the Court concluded that:

> [P]laintiffs cannot prevail simply by showing, if it be shown, that any offer or assurance of immunity was not legally binding under Alabama law. Plaintiffs need receive only an affirmative assurance of immunity. Whether they received such an assurance, and whether any assurance was negated by Black's June meetings with plaintiffs or otherwise, are genuine issues of material fact.

(Order of July 20, 1987, at 7.)

Defendant Valeska, whose briefing is adopted, with or without acknowledgement, by the other defendants, argues that plaintiffs received affirmative assurances of immunity in that: (1) the Assistant Attorneys General and some members of the grand jury told plaintiffs in May that they were "not interested in" plaintiffs and made other, similar statements; (2) prior to their appearance before the grand jury in June, plaintiffs' superior, William H. Black, Jr., read plaintiffs' counsel part of a letter

---

1. Count Two of the complaint alleges that defendants violated plaintiffs' Fifth Amendment rights, and Count Three alleges defendants conspired to do so. With respect to these claims, defendants have reserved such issues as proximate cause, prosecutorial immunity, sovereign immunity, good faith immunity, exhaustion of administrative remedies, and the extent of plaintiffs' damages. (Joint Understanding and Waiver of Rules at 1–2.) Consequently, although the defendants' roles varied, for purposes of these cross-motions the acts of any can be considered the acts of all. The Court thus will make frequent use of the shorthand term, "defendants."

In addition, plaintiffs' claims in Count One for deprivation of property without procedural due process of law, and their claim for injunctive relief in Count Four, are not before the Court on the cross-motions.

from the Governor's legal advisor stating that the legal advisor had received input from the Public Safety Department and the Attorney General's office "indicating that ... the offer of immunity to [plaintiffs] is continuing"; and (3) each plaintiff was given a written offer of immunity at the June grand jury, signed by an Assistant Attorney General and the grand jury foreperson.

Plaintiffs counter that, primarily because defendants made repeated threats to fire plaintiffs under a statute expressly authorizing termination for refusal to waive the Fifth Amendment or immunity from prosecution, they were given at best conflicting signals regarding whether they were being assured of immunity. Plaintiffs argue that, until they received unequivocal assurances of immunity, they were free to rest on the Fifth Amendment.

█ The Court concluded in its July 20, 1987 order that a public employee who has been threatened with termination if he refuses to testify is entitled to invoke the Fifth Amendment until and unless he receives affirmative assurances of immunity from any future prosecution based on the answers given.[2] The Court now concludes that such a public employee has not received adequate assurances of immunity, and can therefore invoke the Fifth Amendment, when he is faced with conflicting signals from his employer and/or the prosecutor as to whether he is being assured of immunity or ordered, on pain of dismissal, to waive his immunity.

The most closely analogous binding case appears to be *Hester v. City of Milledgeville*, 777 F.2d 1492 (11th Cir.1985). The defendant city instituted polygraph testing of its fire department employees and required each employee to sign one of four forms before testing. Two of the forms waived the employee's right to plead the

Fifth Amendment, without offering any affirmative assurances of immunity from prosecution; a third form preserved the tested employee's right to invoke the Fifth Amendment in response to incriminating questions, and the fourth form was a refusal to submit to testing. *Id.* at 1494. Each employee knew he would be fired if he refused to submit to testing; consequently, each was coerced into testifying. *Id.* at 1495.

Since the employees were threatened with termination should they refuse to submit to testing, they were entitled to rest on the Fifth Amendment until and unless they received affirmative assurances of immunity from prosecution. Nothing appeared on the face of the first three forms, nor was anything expressly stated by the employer, to the effect the employees were not perfectly free to choose the third form (under which they would preserve their Fifth Amendment rights and hence obviate assurances of immunity) rather than the first or second forms (under which they would waive the Fifth Amendment's protection without receiving assurances of immunity). *See id.* Nevertheless, the Eleventh Circuit held that the mere existence of the first two forms introduced an ambiguity as to whether their employer was subtly pressuring them to waive the Fifth Amendment without having immunity from prosecution.

It is entirely plausible that laypersons faced with the three positive options with no disclaimer may feel that to save their jobs they must sign the form most generous and accommodating to their employer.... The privilege against self-incrimination is too important to be trifled with in this matter.

*Id.* The Court enjoined polygraph testing until the first two options were removed "or sufficient information [regarding the Fifth Amendment and the waiver thereof]

---

2. The Court held that neither the possibility nor the certainty that use immunity will arise by operation of law, per *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), serves as an adequate substitute for affirmative assurances of immunity. (Order of July 20, 1987, at 4–5.) "[T]he mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effective-

ness [in light of *Garrity*], to coerce a waiver of the immunity it confers on penalty of the loss of employment." *Gardner v. Broderick*, 392 U.S. 273, 279, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968); *see also Benjamin v. City of Montgomery*, 785 F.2d 959, 962 (11th Cir.), *cert. denied*, 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986).

and assurances [of immunity from prosecution are] presented to the employees to guarantee a knowing and voluntary waiver [of the Fifth Amendment]." *Id.* at 1496.

■ As applied to the present case, *Hester* demonstrates that a public employee threatened with termination if he refuses to testify is not required to guess whether the employer (or the prosecutor) is offering immunity or demanding that the employee waive immunity. In the face of garbled or contradictory messages he is free to rest on the Fifth Amendment, and he cannot be terminated for doing so. *Cf. Erwin v. Price*, 778 F.2d 668 (11th Cir.1985) (plaintiff, who was assured at least five times that he would not be prosecuted on the basis of his statements, and was never told otherwise, could be required to answer questions on pain of dismissal).

Turning to the stipulated record governing the parties' cross-motions for summary judgment and for partial summary judgment, the Court concludes that plaintiffs, from the May grand jury through and including the June grand jury, were bombarded with such confused and confusing statements that they were entitled to invoke the Fifth Amendment pending, at least, a clarification that never came.

In May 1985 plaintiffs first appeared before the grand jury. The precise wording of the colloquies varied, but in each case Assistant Attorney General Valeska or Monteil, both defendants in this case, quoted or paraphrased Alabama Code § 36–26–27(c) and threatened termination pursuant to that statute. (May 1985 Grand Jury Transcript at 199; 244–45; 330; 338; 385; 399.) That section, in pertinent part, reads as follows:

> If any employee in the state service ... shall refuse to testify or answer any question ... on the ground that his testi-

mony or answers would tend to incriminate him or refuse to waive immunity from prosecution on account of any matter about which he may be asked to testify ..., such conduct shall be cause for removal.

Ala.Code § 36–26–27(c) (1975).

Section 36–26–27(c) by its express terms would permit a state employee to be fired for pleading the Fifth Amendment or refusing to waive immunity from prosecution even absent an offer of immunity. A threat made to a state employee that he will or may be fired pursuant to this statute, without a clear qualification that he will not be fired unless he has received assurances of immunity, constitutes a threat to fire the employee for engaging in constitutionally protected activity. The Assistant Attorneys General made such threats to plaintiffs before the May grand jury.[3]

Defendants argue that these references to an apparently unconstitutional statute[4] are not important because the Assistant Attorneys General told each plaintiff, whether before or after the threats were made, that the grand jury was "not interested" in plaintiffs' possible misdeeds. (*E.g., May 1985 Grand Jury Transcript at 197; 243; 328; 397.) Even viewed apart from the threats to fire pursuant to the statute, such statements probably would not constitute adequate assurances of immunity.*

A lack of interest before a witness testifies is hardly commensurate with an assurance that, regardless of what the witness truthfully says, he will not be prosecuted. Valeska explained that the grand jury would not indict because "I mean, that's absurd man, look at these folks, they're working people," (*id.* at 254), a statement suggesting plaintiffs had to trust to the

---

**3.** This threat was made most blatantly to plaintiff Sidney Foster: "[Y]ou know that there's a provision in the Alabama Code that says when a State employee takes the Fifth Amendment, that they're terminated from there [sic] job? ... Well, I can assure you that we're going to ask the State Docks to terminate you based on that Code section." (May 1985 Grand Jury transcript, at 199.)

**4.** *See, eg., Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed. 2d 274 (1973); *Uniformed Sanitation Men Association v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968).

grand jury's good instincts to escape indictment. Similarly, Monteil said, "I hope I'm not barking up the wind, these people are not concerned with what you may have been told to do." (*Id.* at 337.) Nor did the foreperson reassure plaintiffs. Twice she said simply, "we're not out to get you," (*id.* at 328, 386), which may rule out personal vendetta, but accurately reflects only the attitude a grand jury is always required to exhibit, even towards the objects of its investigation.

Only plaintiffs Rod Gunter and George Day received any express statements regarding immunity. Gunter was told the grand jury was "willing to give you immunity," (*id.* at 386), not that it had done so or would do so without considering Gunter's testimony. Similarly, Day was told "[t]hey'll [the grand jury will] give you immunity." (*Id.* at 402.) The impact of these statements was further diluted by the statements made to the other plaintiffs.[5]

Furthermore, while the May grand jury was in session, Monteil, the grand jury foreperson, and Mr. Billy Jackson, who served as plaintiff's counsel, held a conference with Mobile County Circuit Judge Michael E. Zoghby. (Jackson Affid. at 1.) They discussed the legality of a proposed immunity to be offered plaintiffs and Judge Zoghby opined that such a grant was ineffective under Alabama law and that he "would not in any event be involved with or approve of any such proposed immunity." (Zoghby Affid. at 2; *accord* Jackson Affid. at 1–2.) Jackson informed plaintiffs of Judge Zoghby's opinions. (Jackson Affid. at 2.) Plaintiffs, who were still appearing before the grand jury, could reasonably believe this information to show they were not being offered any real assurance of immunity.

Viewed without reference to the threats of termination pursuant to section 36–26–27(c), the statements on which defendants rely probably would not constitute assurances of immunity sufficient to require plaintiffs to testify on pain of dismissal. When the threats and Judge Zoghby's input are considered as well, the signals sent plaintiffs were sufficiently crossed to justify plaintiffs in clinging to the Fifth Amendment.

In addition, defendants have not explained how a prosecutor's opinion that a grand jury will not indict a witness assures the witness of what the grand jury will in fact do. Nor do they explain how the statement of a grand juror assures a witness of what the grand jury as a whole will do. Nor have defendants addressed whether a single grand jury's assurance that *it* will not indict assures a witness that *another* grand jury will not seek an indictment using the witness' testimony. *See* Ala.Code § 12–16–216 (allowing disclosure of grand jury testimony to another grand jury in the same circuit "in any manner ... permitted by law," and without this qualification for grand juries sitting in other circuits). Finally, the only cases cited by the parties appear to involve assurances of immunity made by the prosecutor or the employer, not by a grand jury or by a prosecutor on behalf of a grand jury.[6]

Because of the confusion engendered during the May session of the grand jury, defendants were not thereafter writing on a clean slate. The burden fell on defendants to erase the effect of the May experience so that adequate assurances of immunity might then be given.

The next information plaintiffs or Jackson received, according to the Stipulated Record, only worsened the confusion. On June 25, 1985, plaintiffs met with William

---

5. Other statements giving rise to competing inferences were made, but because plaintiffs may not be forced to choose between such inferences, they need not be discussed individually.

6. Even were it the case that, at the May session of the grand jury, plaintiffs received assurances of immunity sufficient to require plaintiffs to testify on pain of dismissal, defendants did not then terminate plaintiffs. By the time they did

so, on July 9, the cumulative set of facts and circumstances before plaintiffs was even more muddled, and they more clearly entitled plaintiffs to rely on the Fifth Amendment. Defendants cannot prevail by showing—which they cannot—that they could have fired plaintiffs constitutionally in May; they must show they could fire plaintiffs constitutionally on July 9.

H. Black, Jr., chief administrative officer at the Alabama State Docks. He met with each plaintiff individually, and in most cases Jackson also was present. The wording of Black's statements varied slightly from meeting to meeting, but in no important respect. The following reflects Black's statements at one meeting and is representative of what occurred at each:

Ernie Cooley. I have been instructed by the Governor to act on behalf of the Director to relay to you some information that he gave to us in a letter to the Director on June 19. And the part that is pertinent to this meeting is that Governor Wallace felt that each of the individuals should be brought into the office individually and given a copy of the statutory requirements and that they should be informed by you [sic] that their failure to cooperate and testify would be a violation of statutory requirements and would result in disciplinary action being taken against them. So I am now handing you your copy of this. The applicable part of the Code which is Section 36–25–27 [sic] and it is outlined the part as sent to me in red. Ken Wallis further said it is hoped that each of the individuals would give the Grand Jury their full cooperation and would freely testify in a truthful manner at the nest [sic] Grand Jury hearing. Also I am instructed after we have the meeting with all the employees and give you the code section as required that I report back to him that this has been done so that they would be able to communicate to the Department of Public Safety and the Attorney General's office each employee has been informed of their responsibility under the statute and have been informed of a very real possibility of serious disciplinary action. That is all I have unless you have something you wanted to ask.

(Transcript of June 25, 1985 Meeting, at 1–2.)

As stated before, a bald threat of disciplinary action under section 36–26–27(c) is tantamount to a threat to fire for refusing to waive the Fifth Amendment or immunity from prosecution. Black's statements to plaintiffs constitute just such a threat.

At a time when no plaintiff was in the room, Black read Jackson a portion of the letter he had received from Ken Wallis, the Governor's legal advisor. In pertinent part, Black read as follows: "[W]e have received [input] from the Public Safety Dept. and the Attorney General's office indicating that ... the offer of immunity to them is continuing." (*Id.* at 10.) Defendants argue that Jackson's knowledge of the quoted language should be imputed to plaintiffs. Because an attorney generally is his client's agent, the Court agrees.

The Court cannot agree, however, that Black's statement to Jackson aids defendants' cause. First, Black was merely a third-hand source of information. Second, the message is not that an offer of immunity *is* continuing, but that Wallis interprets certain correspondence he has received as *"indicating"* an offer is continuing. Third, since no clear offer of immunity, uncontradicted by threat or other statements, was extant at the conclusion of the May session of the grand jury, no offer of immunity could be continuing. Fourth, the next sentence of Wallis' letter, which Black also read to Jackson, again baldly threatens termination under section 36–26–27(c). (*Id.*)

In sum, the interlude with Black did not clear the air but rather provided yet another round of conflicting signals just before the next day's grand jury session.

On June 26, 1985 plaintiffs again appeared before the Mobile County grand jury. The Assistant Attorneys General showed each plaintiff a document stating as follows:

The State of Alabama, by and through the Attorney General's Office, hereby makes known to [a plaintiff's name] that he will not be prosecuted for any offenses which occurred at the Alabama State Docks or involving the Alabama State Docks due to your employment at the Alabama State Docks in the matter of the investigation into the Alabama State Docks, providing the above named individual testifys [sic] truthfully before the Mobile County Grand Jury.

MICHAEL E. ZOGBY [sic], JUDGE
CIRCUIT COURT
[Signed]
[Name redacted], FOREWOMAN
MOBILE COUNTY GRAND JURY
[Signed]
MARK MONTIEL
ASSISTANT ATTORNEY GENERAL

As noted above, plaintiffs knew that Judge Zoghby had opined "that there was [no] legal authority, statutory or otherwise, for the Attorney General to grant total immunity to witnesses appearing before the Grand Jury." (Zoghby Affid. at 2.) They also knew that Judge Zoghby had refused to "be involved with or approve of any such proposed immunity." (*Id.; see also* Jackson Affid. at 2.)

The proffer to the plaintiffs of a proposed grant of immunity, when they well knew that a judge considered the grant ineffectual to bar later prosecution, can hardly be construed as an assurance to plaintiffs that they would not be prosecuted. Further, the proffer contained a signature line for the very judge who had refused to be involved with such a proffer, strengthening the appearance that defendants were trying to pull a fast one.[7]

It is doubtful whether defendants could have counteracted the cumulative effect of their misinformation up to this point with some explanatory remarks. At any rate, they did not attempt to do so. Rather, the Assistant Attorneys General simply read each plaintiff the proffer, showed it to the plaintiff, and asked, "Do you understand that?"[8] Each plaintiff also was reminded of Black's words to him the preceding day (that is, a threat of termination pursuant to section 36–26–27(c)), and some were again threatened with termination under the statute.

A less reassuring atmosphere than that created by defendants is difficult to imagine. The situation is far more egregious than that presented in *Hester v. City of Milledgeville:* there, employees were simply given the opportunity to waive, and the only uncertainty arose from the generalized suspicion, untied to any specific facts, that the employer might be expecting the employees to select waiver over nonwaiver. Here, by threatening termination for violation of a statute demanding waiver of Fifth Amendment protection and by offering "assurances" clearly suspicious on the basis of plaintiffs' knowledge, defendants rendered it impossible for plaintiffs to do more than guess as to whether they would waive immunity from prosecution should they testify. The reasoning of *Hester*, however, prevents employees from being terminated for guessing wrong.

The Eleventh Circuit in *Hester* expressly noted that plaintiffs therein were laypersons. 777 F.2d at 1495. Here, in contrast, plaintiffs were at all relevant times represented by counsel. This distinction, however, makes no difference to the outcome of this case for two reasons. First, plaintiffs' counsel were subjected to the same range of statements, implications and insinuations as were plaintiffs, and to sort them out required more clairvoyance than legal background.

Second, the Assistant Attorneys General and members of the grand jury repeatedly derided plaintiffs for their choice of counsel and implied plaintiffs would be better off trusting to their own instincts rather than

---

7. It is true that plaintiffs were not entitled to a legally binding grant of immunity, but only to affirmative assurances of immunity. (Order of July 20, 1987, at 7.) That the proposed grant would or might have been legally ineffective, then, is of no direct importance. What is important, however, is that plaintiffs knew that a judge had declared to be of no legal effect a document that defendants were telling plaintiffs was a bar to prosecution. At least without explanation, which defendants never offered, plaintiffs were not required to disbelieve the judge and believe defendants who seemingly could not tell the same story twice in a row.

8. The affirmative response of several plaintiffs does not indicate that they took the proffers at face value, but only that they understood the words of the proffer.

spending their money on lawyers.[9] Having encouraged plaintiffs to act as laypersons, and having sought to undermine plaintiffs' confidence in their counsel, defendants cannot now hold plaintiffs to a higher standard.[10]

Defendant Monteil, in a theme later picked up by defendant Valeska, asserts that the principles enunciated in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977), govern this case and that a proper application of them requires that summary judgment be entered in favor of defendants even if plaintiffs did not receive the affirmative assurances of immunity to which they were constitutionally entitled. Specifically, defendants argue that any refusal of plaintiffs to waive their Fifth Amendment rights or immunity from prosecution was an insubstantial factor in the decision to remove them and, even if such refusal was a substantial factor, plaintiffs would have been removed anyway for a constitutionally permissible reason—namely, refusal to testify after having been assured of immunity from prosecution.

The Court concludes that defendants' *Mt. Healthy* argument is not viable. The argument is simply that defendants did not fire plaintiffs just for refusing to testify, but for refusing to testify after being given what defendants consider to be assurances of immunity sufficient so that plaintiffs were not entitled to plead the Fifth Amendment.

The Court's prior discussion explains that plaintiffs engaged in constitutionally protected activity in May and June 1985 when they pleaded the Fifth Amendment before the grand jury. The relevant question under *Mt. Healthy* is whether defendants fired plaintiffs for engaging in that constitutionally protected activity. The Supreme Court there phrased the issue as whether the employer "would have reached the same decision as to respondent's employment even in the absence of *the protected conduct,*" 429 U.S. at 288, 97 S.Ct. at 576 (emphasis added), not whether defendants believed the conduct for which they fired plaintiffs was not constitutionally protected.

Defendants' *Mt. Healthy* argument is not that they did not fire plaintiffs for engaging in the constitutionally protected activity of pleading the Fifth Amendment before the grand jury, but that defendants believed plaintiffs' activity—for which they admittedly were fired—was not constitutionally protected.[11] Such an argument may reflect on whether defendants acted with ill will, but it is not a proper *Mt. Healthy* argument.

Even if defendants' *Mt. Healthy* arguments would make a legal difference, those arguments involve determinations of ultimate fact, a function which generally is beyond the power of a court on a motion for summary judgment. If all the evidence

---

**9.** A few examples will suffice:

Q. Have you ever called another lawyer? Do you think, I mean I'm just asking you, do you think you have a top defense lawyer, or the top lawyers ...
A. I'm just going by what my lawyer advised me to do.
Q. And you hired Hess? Didn't you hire Barry Hess?
A. I went to his firm, I don't know which lawyer ...
Q. Where is the great Barry Hess? Did yall [sic] not pay enough money that you'd get Barry Hess down here, they just sent somebody that worked for him down here to represent yall [sic]?
(May 1985 Grand Jury Transcript at 543.)
Q. ... Now, if you get your job back which I don't believe you will because that's the law and you can read it right here. You're still going to end up paying more mon-

ey probably than you make a year to that lawyer. And you reckon they care about you? (*Id.* at 260; *see also id.* at 246; 262–63; 330; 341; 342; 347.)

**10.** Defendants do prevail on the second of the two subissues on which the central issue on these cross-motions depend. The Court has reviewed the questions asked plaintiffs at both the May and June sessions of the grand jury, and concludes that each plaintiff refused to answer questions "narrowly and specifically related to his official duties." (Order of July 20, 1987, at 2.) Plaintiffs have not argued otherwise.

**11.** The self-serving statements of Valeska and Monteil in their letters of May 19 and July 1, the contents of which, so far as the Stipulated Record discloses, were never made known to plaintiffs, appear relevant for no other purpose.

in the stipulated record, and all the reasonable inferences therefrom, construed most strongly against defendants, led unwaveringly to only one reasonable factual decision on the *Mt. Healthy* issues, no genuine issue of material fact would remain regarding them and summary judgment might be appropriate. However, defendants have conceded that their *Mt. Healthy* arguments are supported only by "the preponderance of the evidence." (Valeska's Reply Brief at 19, 20.) [12]

Defendants' only argument in favor of summary judgment on plaintiffs' claim that defendants conspired to violate plaintiffs' Fifth Amendment rights is that they cannot be liable for conspiracy if they cannot be liable for the substantive offense. Since, on the basis of the Court's opinion on the parties' cross-motions, defendants may still be found liable to plaintiffs for the substantive violation, defendants' sole argument regarding conspiracy fails.

### CONCLUSION

Plaintiffs' motion for partial summary judgment is GRANTED in the following respect and no other:

Plaintiffs' rights under the Fifth Amendment were violated by their termination on July 9, 1985.

Judgment shall be entered accordingly by separate order. In all other respects, all motions for summary judgment and for partial summary judgment are DENIED.

---

12. Without burdening this opinion with all the reasonable inferences that could be drawn from the stipulated record, one is that the Assistant Attorneys General, upon learning that Judge Zoghby would not take part in any proposed grant of immunity and that the Judge considered such a grant to be ineffectual, concluded they could not rely on assurances of immunity to guarantee plaintiffs' ouster for refusal to testify and therefore fell back on the bald language of the statute. A further reasonable inference is that plaintiffs' superiors acquiesced in, and implicitly adopted, the Assistant Attorneys General's rationale in terminating plaintiffs.